Justice BREYER delivered the opinion of the Court.
In Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 878, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), a plurality of the Court concluded that there "exists" an "undue burden" on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the "purpose or effect " of the provision "is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." (Emphasis added.) The plurality added that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." Ibid .
We must here decide whether two provisions of Texas' House Bill 2 violate the Federal Constitution as interpreted in Casey . The first provision, which we shall call the "admitting-privileges requirement, " says that
"[a] physician performing or inducing an abortion ... must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that ... is located not further than 30 miles from the location at which the abortion is performed or induced." Tex. Health & Safety Code Ann. § 171.0031(a) (West Cum. Supp. 2015).
This provision amended Texas law that had previously required an abortion facility to maintain a written protocol "for managing medical emergencies and the transfer of patients requiring further emergency care to a hospital." 38 Tex. Reg. 6546 (2013).
The second provision, which we shall call the "surgical-center requirement, " says that
"the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under [the Texas Health and Safety Code section] for ambulatory surgical centers." Tex. Health & Safety Code Ann. § 245.010(a).
We conclude that neither of these provisions confers medical benefits sufficient to justify the burdens upon access that each imposes. Each places a substantial obstacle in the path of women seeking a previability abortion, each constitutes an undue burden on abortion access, Casey, supra, at 878, 112 S.Ct. 2791 (plurality opinion), and each violates the Federal Constitution. Amdt. 14, § 1.
I
A
In July 2013, the Texas Legislature enacted House Bill 2 (H.B. 2 or Act). In September (before the new law took effect), a group of Texas abortion providers filed an action in Federal District Court seeking facial invalidation of the law's admitting-privileges provision. In late October, the District Court granted the injunction. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 951 F.Supp.2d 891, 901 (W.D.Tex.2013). But three days later, the Fifth Circuit vacated the injunction, thereby permitting the provision to take effect. Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 734 F.3d 406, 419 (2013).
The Fifth Circuit subsequently upheld the provision, and set forth its reasons in an opinion released late the following March. In that opinion, the Fifth Circuit pointed to evidence introduced in the District Court the previous October. It noted that Texas had offered evidence designed *2301 to show that the admitting-privileges requirement "will reduce the delay in treatment and decrease health risk for abortion patients with critical complications," and that it would " 'screen out' untrained or incompetent abortion providers." Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 748 F.3d 583, 592 (2014) (Abbott ). The opinion also explained that the plaintiffs had not provided sufficient evidence "that abortion practitioners will likely be unable to comply with the privileges requirement." Id., at 598. The court said that all "of the major Texas cities, including Austin, Corpus Christi, Dallas, El Paso, Houston, and San Antonio," would "continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges." Ibid. The Abbott plaintiffs did not file a petition for certiorari in this Court.
B
On April 6, one week after the Fifth Circuit's decision, petitioners, a group of abortion providers (many of whom were plaintiffs in the previous lawsuit), filed the present lawsuit in Federal District Court. They sought an injunction preventing enforcement of the admitting-privileges provision as applied to physicians at two abortion facilities, one operated by Whole Woman's Health in McAllen and the other operated by Nova Health Systems in El Paso. They also sought an injunction prohibiting enforcement of the surgical-center provision anywhere in Texas. They claimed that the admitting-privileges provision and the surgical-center provision violated the Constitution's Fourteenth Amendment, as interpreted in Casey .
The District Court subsequently received stipulations from the parties and depositions from the parties' experts. The court conducted a 4-day bench trial. It heard, among other testimony, the opinions from expert witnesses for both sides. On the basis of the stipulations, depositions, and testimony, that court reached the following conclusions:
1. Of Texas' population of more than 25 million people, "approximately 5.4 million" are "women" of "reproductive age," living within a geographical area of "nearly 280,000 square miles." Whole Woman's Health v. Lakey, 46 F.Supp.3d 673, 681 (W.D.Tex.2014) ; see App. 244.
2. "In recent years, the number of abortions reported in Texas has stayed fairly consistent at approximately 15-16% of the reported pregnancy rate, for a total number of approximately 60,000-72,000 legal abortions performed annually." 46 F.Supp.3d, at 681 ; see App. 238.
3. Prior to the enactment of H.B. 2, there were more than 40 licensed abortion facilities in Texas, which "number dropped by almost half leading up to and in the wake of enforcement of the admitting-privileges requirement that went into effect in late-October 2013." 46 F.Supp.3d, at 681 ; App. 228-231.
4. If the surgical-center provision were allowed to take effect, the number of abortion facilities, after September 1, 2014, would be reduced further, so that "only seven facilities and a potential eighth will exist in Texas." 46 F.Supp.3d, at 680 ; App. 182-183.
5. Abortion facilities "will remain only in Houston, Austin, San Antonio, and the Dallas/Fort Worth metropolitan region." 46 F.Supp.3d, at 681 ; App. 229-230. These include "one facility in Austin, two in Dallas, one in Fort Worth, two in Houston, and either one or two in San Antonio." 46 F.Supp.3d, at 680 ; App. 229-230.
6. "Based on historical data pertaining to Texas's average number of abortions, and assuming perfectly equal distribution among the remaining seven or eight providers, *2302 this would result in each facility serving between 7,500 and 10,000 patients per year. Accounting for the seasonal variations in pregnancy rates and a slightly unequal distribution of patients at each clinic, it is foreseeable that over 1,200 women per month could be vying for counseling, appointments, and follow-up visits at some of these facilities." 46 F.Supp.3d, at 682 ; cf. App. 238.
7. The suggestion "that these seven or eight providers could meet the demand of the entire state stretches credulity." 46 F.Supp.3d, at 682 ; see App. 238.
8. "Between November 1, 2012 and May 1, 2014," that is, before and after enforcement of the admitting-privileges requirement, "the decrease in geographical distribution of abortion facilities" has meant that the number of women of reproductive age living more than 50 miles from a clinic has doubled (from 800,000 to over 1.6 million); those living more than 100 miles has increased by 150% (from 400,000 to 1 million); those living more than 150 miles has increased by more than 350% (from 86,000 to 400,000); and those living more than 200 miles has increased by about 2,800% (from 10,000 to 290,000). After September 2014, should the surgical-center requirement go into effect, the number of women of reproductive age living significant distances from an abortion provider will increase as follows: 2 million women of reproductive age will live more than 50 miles from an abortion provider; 1.3 million will live more than 100 miles from an abortion provider; 900,000 will live more than 150 miles from an abortion provider; and 750,000 more than 200 miles from an abortion provider. 46 F.Supp.3d, at 681-682 ; App. 238-242.
9. The "two requirements erect a particularly high barrier for poor, rural, or disadvantaged women." 46 F.Supp.3d, at 683 ; cf. App. 363-370.
10. "The great weight of evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure." 46 F.Supp.3d, at 684 ; see, e.g., App. 257-259, 538; see also id., at 200-202, 253-257.
11. "Abortion, as regulated by the State before the enactment of House Bill 2, has been shown to be much safer, in terms of minor and serious complications, than many common medical procedures not subject to such intense regulation and scrutiny." 46 F.Supp.3d, at 684 ; see, e.g., App. 223-224 (describing risks in colonoscopies ), 254 (discussing risks in vasectomy and endometrial biopsy, among others), 275-277 (discussing complication rate in plastic surgery ).
12. "Additionally, risks are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to nonsurgical-center facilities." 46 F.Supp.3d, at 684 ; App. 202-206, 257-259.
13. "[W]omen will not obtain better care or experience more frequent positive outcomes at an ambulatory surgical center as compared to a previously licensed facility." 46 F.Supp.3d, at 684 ; App. 202-206.
14. "[T]here are 433 licensed ambulatory surgical centers in Texas," of which "336 ... are apparently either 'grandfathered' or enjo[y] the benefit of a waiver of some or all" of the surgical-center "requirements." 46 F.Supp.3d, at 680-681 ; App. 184.
15. The "cost of coming into compliance" with the surgical-center requirement "for existing clinics is significant," "undisputedly approach[ing] 1 million dollars," and "most likely exceed[ing] 1.5 million dollars," with "[s]ome ... clinics" unable to "comply due to physical size limitations *2303 of their sites." 46 F.Supp.3d, at 682. The "cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars." Ibid.
On the basis of these and other related findings, the District Court determined that the surgical-center requirement "imposes an undue burden on the right of women throughout Texas to seek a previability abortion," and that the "admitting-privileges requirement, ... in conjunction with the ambulatory-surgical-center requirement, imposes an undue burden on the right of women in the Rio Grande Valley, El Paso, and West Texas to seek a previability abortion." Id., at 687. The District Court concluded that the "two provisions" would cause "the closing of almost all abortion clinics in Texas that were operating legally in the fall of 2013," and thereby create a constitutionally "impermissible obstacle as applied to all women seeking a previability abortion" by "restricting access to previously available legal facilities." Id., at 687-688. On August 29, 2014, the court enjoined the enforcement of the two provisions. Ibid.
C
On October 2, 2014, at Texas' request, the Court of Appeals stayed the District Court's injunction. Whole Woman's Health v. Lakey, 769 F.3d 285, 305. Within the next two weeks, this Court vacated the Court of Appeals' stay (in substantial part) thereby leaving in effect the District Court's injunction against enforcement of the surgical-center provision and its injunction against enforcement of the admitting-privileges requirement as applied to the McAllen and El Paso clinics. Whole Woman's Health v. Lakey, 574 U.S. ----, 135 S.Ct. 399, 190 L.Ed.2d 247 (2014). The Court of Appeals then heard Texas' appeal.
On June 9, 2015, the Court of Appeals reversed the District Court on the merits. With minor exceptions, it found both provisions constitutional and allowed them to take effect. Whole Women's Health v. Cole, 790 F.3d 563, 567 (per curiam ), modified, 790 F.3d 598 (C.A.5 2015). Because the Court of Appeals' decision rests upon alternative grounds and fact-related considerations, we set forth its basic reasoning in some detail. The Court of Appeals concluded:
• The District Court was wrong to hold the admitting-privileges requirement unconstitutional because (except for the clinics in McAllen and El Paso) the providers had not asked them to do so, and principles of res judicata barred relief. Id., at 580-583.
• Because the providers could have brought their constitutional challenge to the surgical-center provision in their earlier lawsuit, principles of res judicata also barred that claim. Id., at 581-583.
• In any event, a state law "regulating previability abortion is constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest." Id., at 572.
• "[B]oth the admitting privileges requirement and" the surgical-center requirement "were rationally related to a legitimate state interest," namely, "rais[ing] the standard and quality of care for women seeking abortions and ... protect[ing] the health and welfare of women seeking abortions." Id., at 584.
• The "[p]laintiffs" failed "to proffer competent evidence contradicting the legislature's statement of a legitimate purpose." Id., at 585.
*2304 • "[T]he district court erred by substituting its own judgment [as to the provisions' effects] for that of the legislature, albeit ... in the name of the undue burden inquiry." Id., at 587.
• Holding the provisions unconstitutional on their face is improper because the plaintiffs had failed to show that either of the provisions "imposes an undue burden on a large fraction of women." Id., at 590.
• The District Court erred in finding that, if the surgical-center requirement takes effect, there will be too few abortion providers in Texas to meet the demand. That factual determination was based upon the finding of one of plaintiffs' expert witnesses (Dr. Grossman) that abortion providers in Texas " 'will not be able to go from providing approximately 14,000 abortions annually, as they currently are, to providing the 60,000 to 70,000 abortions that are done each year in Texas once all' " of the clinics failing to meet the surgical-center requirement " 'are forced to close.' " Id., at 589-590. But Dr. Grossman's opinion is (in the Court of Appeals' view) " 'ipse dixit ' "; the " 'record lacks any actual evidence regarding the current or future capacity of the eight clinics' "; and there is no "evidence in the record that" the providers that currently meet the surgical-center requirement "are operating at full capacity or that they cannot increase capacity." Ibid.
For these and related reasons, the Court of Appeals reversed the District Court's holding that the admitting-privileges requirement is unconstitutional and its holding that the surgical-center requirement is unconstitutional. The Court of Appeals upheld in part the District Court's more specific holding that the requirements are unconstitutional as applied to the McAllen facility and Dr. Lynn (a doctor at that facility), but it reversed the District Court's holding that the surgical-center requirement is unconstitutional as applied to the facility in El Paso. In respect to this last claim, the Court of Appeals said that women in El Paso wishing to have an abortion could use abortion providers in nearby New Mexico.
II
Before turning to the constitutional question, we must consider the Court of Appeals' procedural grounds for holding that (but for the challenge to the provisions of H.B. 2 as applied to McAllen and El Paso) petitioners were barred from bringing their constitutional challenges.
A
Claim Preclusion-Admitting-Privileges Requirement
The Court of Appeals held that there could be no facial challenge to the admitting-privileges requirement. Because several of the petitioners here had previously brought an unsuccessful facial challenge to that requirement (namely, Abbott, 748 F.3d, at 605 ; see supra, at 2300 - 2301), the Court of Appeals thought that "the principle of res judicata" applied. 790 F.3d, at 581. The Court of Appeals also held that res judicata prevented the District Court from granting facial relief to petitioners, concluding that it was improper to "facially invalidat[e] the admitting privileges requirement," because to do so would "gran[t] more relief than anyone requested or briefed." Id., at 580. We hold that res judicata neither bars petitioners' challenges to the admitting-privileges requirement nor prevents us from awarding facial relief.
For one thing, to the extent that the Court of Appeals concluded that the principle of res judicata bars any facial challenge to the admitting-privileges requirement, see ibid., the court misconstrued *2305 petitioners' claims. Petitioners did not bring a facial challenge to the admitting-privileges requirement in this case but instead challenged that requirement as applied to the clinics in McAllen and El Paso. The question is whether res judicata bars petitioners' particular as-applied claims. On this point, the Court of Appeals concluded that res judicata was no bar, see 790 F.3d, at 592, and we agree.
The doctrine of claim preclusion (the here-relevant aspect of res judicata) prohibits "successive litigation of the very same claim" by the same parties. New Hampshire v. Maine, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Petitioners' postenforcement as-applied challenge is not "the very same claim" as their preenforcement facial challenge. The Restatement of Judgments notes that development of new material facts can mean that a new case and an otherwise similar previous case do not present the same claim. See Restatement (Second) of Judgments § 24, Comment f (1980) ( "Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first"); cf. id., § 20(2) ("A valid and final personal judgment for the defendant, which rests on the prematurity of the action or on the plaintiff's failure to satisfy a precondition to suit, does not bar another action by the plaintiff instituted after the claim has matured, or the precondition has been satisfied"); id., § 20, Comment k (discussing relationship of this rule with § 24, Comment f ). The Courts of Appeals have used similar rules to determine the contours of a new claim for purposes of preclusion. See, e.g., Morgan v. Covington, 648 F.3d 172, 178 (C.A.3 2011) ("[R]es judicata does not bar claims that are predicated on events that postdate the filing of the initial complaint"); Ellis v. CCA of Tenn. LLC, 650 F.3d 640, 652 (C.A.7 2011) ; Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 919 (C.A.2 2010) ; Smith v. Potter, 513 F.3d 781, 783 (C.A.7 2008) ; Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 529 (C.A.6 2006) ; Manning v. Auburn, 953 F.2d 1355, 1360 (C.A.11 1992). The Restatement adds that, where "important human values-such as the lawfulness of continuing personal disability or restraint-are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought." § 24, Comment f ; see Bucklew v. Lombardi, 783 F.3d 1120, 1127 (C.A.8 2015) (allowing as-applied challenge to execution method to proceed notwithstanding prior facial challenge).
We find this approach persuasive. Imagine a group of prisoners who claim that they are being forced to drink contaminated water. These prisoners file suit against the facility where they are incarcerated. If at first their suit is dismissed because a court does not believe that the harm would be severe enough to be unconstitutional, it would make no sense to prevent the same prisoners from bringing a later suit if time and experience eventually showed that prisoners were dying from contaminated water. Such circumstances would give rise to a new claim that the prisoners' treatment violates the Constitution. Factual developments may show that constitutional harm, which seemed too remote or speculative to afford relief at the time of an earlier suit, was in fact indisputable. In our view, such changed circumstances will give rise to a new constitutional claim. This approach is sensible, and it is consistent with our precedent. See Abie State Bank v. Bryan, 282 U.S. 765, 772, 51 S.Ct. 252, 75 L.Ed. 690 (1931) (where "suit was brought immediately upon the enactment *2306 of the law," "decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing [its] validity ... in the lights of the later actual experience"); cf. Lawlor v. National Screen Service Corp., 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) (judgment that "precludes recovery on claims arising prior to its entry" nonetheless "cannot be given the effect of extinguishing claims which did not even then exist"); United States v. Carolene Products Co., 304 U.S. 144, 153, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist"); Nashville, C. & St. L.R. Co. v. Walters, 294 U.S. 405, 415, 55 S.Ct. 486, 79 L.Ed. 949 (1935) ("A statute valid as to one set of facts may be invalid as to another. A statute valid when enacted may become invalid by change in the conditions to which it is applied" (footnote omitted)); Third Nat. Bank of Louisville v. Stone, 174 U.S. 432, 434, 19 S.Ct. 759, 43 L.Ed. 1035 (1899) ("A question cannot be held to have been adjudged before an issue on the subject could possibly have arisen"). Justice ALITO'S dissenting opinion is simply wrong that changed circumstances showing that a challenged law has an unconstitutional effect cannot give rise to a new claim. See post, at 2328 - 2329 (hereinafter the dissent).
Changed circumstances of this kind are why the claim presented in Abbott is not the same claim as petitioners' claim here. The claims in both Abbott and the present case involve "important human values." Restatement (Second) of Judgments § 24, Comment f . We are concerned with H.B. 2's "effect ... on women seeking abortions." Post, at 2345 - 2346 (ALITO, J., dissenting). And that effect has changed dramatically since petitioners filed their first lawsuit. Abbott rested on facts and evidence presented to the District Court in October 2013. 748 F.3d, at 599, n. 14 (declining to "consider any arguments" based on "developments since the conclusion of the bench trial"). Petitioners' claim in this case rests in significant part upon later, concrete factual developments. Those developments matter. The Abbott plaintiffs brought their facial challenge to the admitting-privileges requirement prior to its enforcement -before many abortion clinics had closed and while it was still unclear how many clinics would be affected. Here, petitioners bring an as-applied challenge to the requirement after its enforcement -and after a large number of clinics have in fact closed. The postenforcement consequences of H.B. 2 were unknowable before it went into effect. The Abbott court itself recognized that "[l]ater as-applied challenges can always deal with subsequent, concrete constitutional issues." Id., at 589. And the Court of Appeals in this case properly decided that new evidence presented by petitioners had given rise to a new claim and that petitioners' as-applied challenges are not precluded. See 790 F.3d, at 591 ("We now know with certainty that the non-[surgical-center] abortion facilities have actually closed and physicians have been unable to obtain admitting privileges after diligent effort").
When individuals claim that a particular statute will produce serious constitutionally relevant adverse consequences before they have occurred-and when the courts doubt their likely occurrence-the factual difference that those adverse consequences have in fact occurred can make all the difference. Compare the Fifth Circuit's opinion in the earlier case, Abbott, supra, at 598 ("All of the major Texas cities ... continue to have multiple clinics where many physicians will have or obtain hospital admitting privileges"), with the facts *2307 found in this case, 46 F.Supp.3d, at 680 (the two provisions will leave Texas with seven or eight clinics). The challenge brought in this case and the one in Abbott are not the "very same claim," and the doctrine of claim preclusion consequently does not bar a new challenge to the constitutionality of the admitting-privileges requirement. New Hampshire v. Maine, 532 U.S., at 748, 121 S.Ct. 1808. That the litigants in Abbott did not seek review in this Court, as the dissent suggests they should have done, see post, at 2326, does not prevent them from seeking review of new claims that have arisen after Abbott was decided. In sum, the Restatement, cases from the Courts of Appeals, our own precedent, and simple logic combine to convince us that res judicata does not bar this claim.
The Court of Appeals also concluded that the award of facial relief was precluded by principles of res judicata. 790 F.3d, at 581. The court concluded that the District Court should not have "granted more relief than anyone requested or briefed." Id., at 580. But in addition to asking for as-applied relief, petitioners asked for "such other and further relief as the Court may deem just, proper, and equitable." App. 167. Their evidence and arguments convinced the District Court that the provision was unconstitutional across the board. The Federal Rules of Civil Procedure state that (with an exception not relevant here) a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Rule 54(c). And we have held that, if the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is "proper." Citizens United v. Federal Election Comm'n, 558 U.S. 310, 333, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ; see ibid. (in "the exercise of its judicial responsibility" it may be "necessary ... for the Court to consider the facial validity" of a statute, even though a facial challenge was not brought); cf. Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1339 (2000) ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases"). Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims.
B
Claim Preclusion-Surgical-Center Requirement
The Court of Appeals also held that claim preclusion barred petitioners from contending that the surgical-center requirement is unconstitutional. 790 F.3d, at 583. Although it recognized that petitioners did not bring this claim in Abbott, it believed that they should have done so. The court explained that petitioners' constitutional challenge to the surgical-center requirement and the challenge to the admitting-privileges requirement mounted in Abbott
"arise from the same 'transactio[n] or series of connected transactions.' ... The challenges involve the same parties and abortion facilities; the challenges are governed by the same legal standards; the provisions at issue were enacted at the same time as part of the same act; the provisions were motivated by a common purpose; the provisions are administered by the same state officials; and the challenges form a convenient trial unit because they rely on a common nucleus of operative facts." 790 F.3d, at 581.
*2308 For all these reasons, the Court of Appeals held petitioners' challenge to H.B. 2's surgical-center requirement was precluded.
The Court of Appeals failed, however, to take account of meaningful differences. The surgical-center provision and the admitting-privileges provision are separate, distinct provisions of H.B. 2. They set forth two different, independent requirements with different enforcement dates. This Court has never suggested that challenges to two different statutory provisions that serve two different functions must be brought in a single suit. And lower courts normally treat challenges to distinct regulatory requirements as "separate claims," even when they are part of one overarching "[g]overnment regulatory scheme." 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4408, p. 52 (2d ed. 2002, Supp. 2015) ; see Hamilton's Bogarts, Inc. v. Michigan, 501 F.3d 644, 650 (C.A.6 2007).
That approach makes sense. The opposite approach adopted by the Court of Appeals would require treating every statutory enactment as a single transaction which a given party would only be able to challenge one time, in one lawsuit, in order to avoid the effects of claim preclusion. Such a rule would encourage a kitchen-sink approach to any litigation challenging the validity of statutes. That outcome is less than optimal-not only for litigants, but for courts.
There are other good reasons why petitioners should not have had to bring their challenge to the surgical-center provision at the same time they brought their first suit. The statute gave the Texas Department of State Health Services authority to make rules implementing the surgical-center requirement. H.B. 2, § 11(a), App. to Pet. for Cert. 201a. At the time petitioners filed Abbott, that state agency had not yet issued any such rules. Cf. EPA v. Brown, 431 U.S. 99, 104, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977) (per curiam ); 13B Wright, supra, § 3532.6, at 629 (3d ed. 2008) (most courts will not "undertake review before rules have been adopted"); Natural Resources Defense Council, Inc. v. EPA, 859 F.2d 156, 204 (C.A.D.C.1988).
Further, petitioners might well have expected that those rules when issued would contain provisions grandfathering some then-existing abortion facilities and granting full or partial waivers to others. After all, more than three quarters of non-abortion-related surgical centers had benefited from that kind of provision. See 46 F.Supp.3d, at 680-681 (336 of 433 existing Texas surgical centers have been grandfathered or otherwise enjoy a waiver of some of the surgical-center requirements); see also App. 299-302, 443-447, 468-469.
Finally, the relevant factual circumstances changed between Abbott and the present lawsuit, as we previously described. See supra, at 2306 - 2307.
The dissent musters only one counterargument. According to the dissent, if statutory provisions "impos[e] the same kind of burden ... on the same kind of right" and have mutually reinforcing effects, "it is evident that" they are "part of the same transaction" and must be challenged together. Post, at 2340 - 2341, 2341. But for the word "evident," the dissent points to no support for this conclusion, and we find it unconvincing. Statutes are often voluminous, with many related, yet distinct, provisions. Plaintiffs, in order to preserve their claims, need not challenge each such provision of, say, the USA PATRIOT Act, the Bipartisan Campaign Reform Act of 2002, the National Labor Relations Act, the Clean Water Act, the Antiterrorism and Effective Death Penalty Act of 1996, or the Patient *2309 Protection and Affordable Care Act in their first lawsuit.
For all of these reasons, we hold that the petitioners did not have to bring their challenge to the surgical-center provision when they challenged the admitting-privileges provision in Abbott . We accordingly hold that the doctrine of claim preclusion does not prevent them from bringing that challenge now.
* * *
In sum, in our view, none of petitioners' claims are barred by res judicata. For all of the reasons described above, we conclude that the Court of Appeals' procedural ruling was incorrect. Cf. Brief for Professors Michael Dorf et al. as Amici Curiae 22 (professors in civil procedure from Cornell Law School, New York University School of Law, Columbia Law School, University of Chicago Law School, and Duke University Law School) (maintaining that "the panel's procedural ruling" was "clearly incorrect"). We consequently proceed to consider the merits of petitioners' claims.
III
Undue Burden-Legal Standard
We begin with the standard, as described in Casey. We recognize that the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." Roe v. Wade, 410 U.S. 113, 150, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). But, we added, "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." Casey, 505 U.S., at 877, 112 S.Ct. 2791 (plurality opinion). Moreover, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." Id ., at 878, 112 S.Ct. 2791.
The Court of Appeals wrote that a state law is "constitutional if: (1) it does not have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus; and (2) it is reasonably related to (or designed to further) a legitimate state interest." 790 F.3d, at 572. The Court of Appeals went on to hold that "the district court erred by substituting its own judgment for that of the legislature" when it conducted its "undue burden inquiry," in part because "medical uncertainty underlying a statute is for resolution by legislatures, not the courts." Id., at 587 (citing Gonzales v. Carhart, 550 U.S. 124, 163, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ).
The Court of Appeals' articulation of the relevant standard is incorrect. The first part of the Court of Appeals' test may be read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden. The rule announced in Casey, however, requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer. See 505 U.S., at 887-898, 112 S.Ct. 2791 (opinion of the Court) (performing this balancing with respect to a spousal notification provision); id., at 899-901, 112 S.Ct. 2791 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.) (same balancing with respect to a parental notification provision). And the second part of the test is wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue. See, e.g., Williamson v. Lee Optical of Okla., Inc., *2310 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The Court of Appeals' approach simply does not match the standard that this Court laid out in Casey, which asks courts to consider whether any burden imposed on abortion access is "undue."
The statement that legislatures, and not courts, must resolve questions of medical uncertainty is also inconsistent with this Court's case law. Instead, the Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings. In Casey, for example, we relied heavily on the District Court's factual findings and the research-based submissions of amici in declaring a portion of the law at issue unconstitutional. 505 U.S., at 888-894, 112 S.Ct. 2791 (opinion of the Court) (discussing evidence related to the prevalence of spousal abuse in determining that a spousal notification provision erected an undue burden to abortion access). And, in Gonzales the Court, while pointing out that we must review legislative "factfinding under a deferential standard," added that we must not "place dispositive weight" on those "findings." 550 U.S., at 165, 127 S.Ct. 1610. Gonzales went on to point out that the "Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake ." Ibid. (emphasis added). Although there we upheld a statute regulating abortion, we did not do so solely on the basis of legislative findings explicitly set forth in the statute, noting that "evidence presented in the District Courts contradicts" some of the legislative findings. Id., at 166, 127 S.Ct. 1610. In these circumstances, we said, "[u]ncritical deference to Congress' factual findings ... is inappropriate." Ibid.
Unlike in Gonzales, the relevant statute here does not set forth any legislative findings. Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective (namely, protecting women's health). Id ., at 149-150, 127 S.Ct. 1610. For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law. As we shall describe, the District Court did so here. It did not simply substitute its own judgment for that of the legislature. It considered the evidence in the record-including expert evidence, presented in stipulations, depositions, and testimony. It then weighed the asserted benefits against the burdens. We hold that, in so doing, the District Court applied the correct legal standard.
IV
Undue Burden-Admitting-Privileges Requirement
Turning to the lower courts' evaluation of the evidence, we first consider the admitting-privileges requirement. Before the enactment of H.B. 2, doctors who provided abortions were required to "have admitting privileges or have a working arrangement with a physician(s) who has admitting privileges at a local hospital in order to ensure the necessary back up for medical complications." Tex. Admin. Code, tit. 25, § 139.56 (2009) (emphasis added). The new law changed this requirement by requiring that a "physician performing or inducing an abortion ... must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that ... is located not further than 30 miles from the location at which the abortion is performed or induced." Tex. Health & Safety Code Ann. § 171.0031(a). The District Court held that the legislative change imposed an "undue *2311 burden" on a woman's right to have an abortion. We conclude that there is adequate legal and factual support for the District Court's conclusion.
The purpose of the admitting-privileges requirement is to help ensure that women have easy access to a hospital should complications arise during an abortion procedure. Brief for Respondents 32-37. But the District Court found that it brought about no such health-related benefit. The court found that "[t]he great weight of evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure." 46 F.Supp.3d, at 684. Thus, there was no significant health-related problem that the new law helped to cure.
The evidence upon which the court based this conclusion included, among other things:
• A collection of at least five peer-reviewed studies on abortion complications in the first trimester, showing that the highest rate of major complications-including those complications requiring hospital admission-was less than one-quarter of 1%. See App. 269-270.
• Figures in three peer-reviewed studies showing that the highest complication rate found for the much rarer second trimester abortion was less than one-half of 1% (0.45% or about 1 out of about 200). Id., at 270.
• Expert testimony to the effect that complications rarely require hospital admission, much less immediate transfer to a hospital from an outpatient clinic. Id ., at 266-267 (citing a study of complications occurring within six weeks after 54,911 abortions that had been paid for by the fee-for-service California Medicaid Program finding that the incidence of complications was 2.1%, the incidence of complications requiring hospital admission was 0.23%, and that of the 54,911 abortion patients included in the study, only 15 required immediate transfer to the hospital on the day of the abortion).
• Expert testimony stating that "it is extremely unlikely that a patient will experience a serious complication at the clinic that requires emergent hospitalization" and "in the rare case in which [one does], the quality of care that the patient receives is not affected by whether the abortion provider has admitting privileges at the hospital." Id ., at 381.
• Expert testimony stating that in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of these complications occur in the days after the abortion, not on the spot. See id., at 382; see also id ., at 267.
• Expert testimony stating that a delay before the onset of complications is also expected for medical abortions, as "abortifacient drugs take time to exert their effects, and thus the abortion itself almost always occurs after the patient has left the abortion facility." Id ., at 278.
• Some experts added that, if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home. See, e.g., id ., at 153.
We have found nothing in Texas' record evidence that shows that, compared to prior law (which required a "working arrangement" with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health.
We add that, when directly asked at oral argument whether Texas knew of a single instance in which the new requirement would have helped even one woman obtain better treatment, Texas admitted that *2312 there was no evidence in the record of such a case. See Tr. of Oral Arg. 47. This answer is consistent with the findings of the other Federal District Courts that have considered the health benefits of other States' similar admitting-privileges laws. See Planned Parenthood of Wis., Inc. v. Van Hollen, 94 F.Supp.3d 949, 953 (W.D.Wis.2015), aff'd sub nom . Planned Parenthood of Wis., Inc . v . Schimel, 806 F.3d 908 (C.A.7 2015) ; Planned Parenthood Southeast, Inc. v. Strange, 33 F.Supp.3d 1330, 1378 (M.D.Ala.2014).
At the same time, the record evidence indicates that the admitting-privileges requirement places a "substantial obstacle in the path of a woman's choice." Casey, 505 U.S., at 877, 112 S.Ct. 2791 (plurality opinion). The District Court found, as of the time the admitting-privileges requirement began to be enforced, the number of facilities providing abortions dropped in half, from about 40 to about 20. 46 F.Supp.3d, at 681. Eight abortion clinics closed in the months leading up to the requirement's effective date. See App. 229-230; cf. Brief for Planned Parenthood Federation of America et al. as Amici Curiae 14 (noting that abortion facilities in Waco, San Angelo, and Midland no longer operate because Planned Parenthood is "unable to find local physicians in those communities with privileges who are willing to provide abortions due to the size of those communities and the hostility that abortion providers face"). Eleven more closed on the day the admitting-privileges requirement took effect. See App. 229-230; Tr. of Oral Arg. 58.
Other evidence helps to explain why the new requirement led to the closure of clinics. We read that other evidence in light of a brief filed in this Court by the Society of Hospital Medicine. That brief describes the undisputed general fact that "hospitals often condition admitting privileges on reaching a certain number of admissions per year." Brief for Society of Hospital Medicine et al. as Amici Curiae 11. Returning to the District Court record, we note that, in direct testimony, the president of Nova Health Systems, implicitly relying on this general fact, pointed out that it would be difficult for doctors regularly performing abortions at the El Paso clinic to obtain admitting privileges at nearby hospitals because "[d]uring the past 10 years, over 17,000 abortion procedures were performed at the El Paso clinic [and n]ot a single one of those patients had to be transferred to a hospital for emergency treatment, much less admitted to the hospital." App. 730. In a word, doctors would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit.
Other amicus briefs filed here set forth without dispute other common prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures. See Brief for Medical Staff Professionals as Amici Curiae 20-25 (listing, for example, requirements that an applicant has treated a high number of patients in the hospital setting in the past year, clinical data requirements, residency requirements, and other discretionary factors); see also Brief for American College of Obstetricians and Gynecologists et al. as Amici Curiae 16 (ACOG Brief) ("[S]ome academic hospitals will only allow medical staff membership for clinicians who also ... accept faculty appointments"). Again, returning to the District Court record, we note that Dr. Lynn of the McAllen clinic, a veteran obstetrics and gynecology doctor who estimates that he has delivered over 15,000 babies in his 38 years in practice was unable to get admitting privileges at any of the seven hospitals within 30 miles of his clinic. App. 390-394. He was refused *2313 admitting privileges at a nearby hospital for reasons, as the hospital wrote, "not based on clinical competence considerations." Id., at 393-394 (emphasis deleted). The admitting-privileges requirement does not serve any relevant credentialing function.
In our view, the record contains sufficient evidence that the admitting-privileges requirement led to the closure of half of Texas' clinics, or thereabouts. Those closures meant fewer doctors, longer waiting times, and increased crowding. Record evidence also supports the finding that after the admitting-privileges provision went into effect, the "number of women of reproductive age living in a county ... more than 150 miles from a provider increased from approximately 86,000 to 400,000 ... and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000." 46 F.Supp.3d, at 681. We recognize that increased driving distances do not always constitute an "undue burden." See Casey, 505 U.S., at 885-887, 112 S.Ct. 2791 (joint opinion of O'Connor, KENNEDY, and Souter, JJ.). But here, those increases are but one additional burden, which, when taken together with others that the closings brought about, and when viewed in light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's "undue burden" conclusion. Cf. id., at 895, 112 S.Ct. 2791 (opinion of the Court) (finding burden "undue" when requirement places "substantial obstacle to a woman's choice" in "a large fraction of the cases in which" it "is relevant").
The dissent's only argument why these clinic closures, as well as the ones discussed in Part V, infra, may not have imposed an undue burden is this: Although "H.B. 2 caused the closure of some clinics," post, at 2343 (emphasis added), other clinics may have closed for other reasons (so we should not "actually count" the burdens resulting from those closures against H.B. 2), post, at 2345 - 2347. But petitioners satisfied their burden to present evidence of causation by presenting direct testimony as well as plausible inferences to be drawn from the timing of the clinic closures. App. 182-183, 228-231. The District Court credited that evidence and concluded from it that H.B. 2 in fact led to the clinic closures. 46 F.Supp.3d, at 680-681. The dissent's speculation that perhaps other evidence, not presented at trial or credited by the District Court, might have shown that some clinics closed for unrelated reasons does not provide sufficient ground to disturb the District Court's factual finding on that issue.
In the same breath, the dissent suggests that one benefit of H.B. 2's requirements would be that they might "force unsafe facilities to shut down." Post, at 2343. To support that assertion, the dissent points to the Kermit Gosnell scandal. Gosnell, a physician in Pennsylvania, was convicted of first-degree murder and manslaughter. He "staffed his facility with unlicensed and indifferent workers, and then let them practice medicine unsupervised" and had "[d]irty facilities; unsanitary instruments; an absence of functioning monitoring and resuscitation equipment; the use of cheap, but dangerous, drugs; illegal procedures; and inadequate emergency access for when things inevitably went wrong." Report of Grand Jury in No. 0009901-2008 (1st Jud. Dist. Pa., Jan. 14, 2011), p. 24, online at http://www.phila.gov/districtattorney/pdfs/grandjurywomensmedical.pdf (as last visited June 27, 2016). Gosnell's behavior was terribly wrong. But there is no reason to believe that an extra layer of regulation would have affected that behavior. Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced *2314 to adopt safe practices by a new overlay of regulations. Regardless, Gosnell's deplorable crimes could escape detection only because his facility went uninspected for more than 15 years. Id., at 20. Pre-existing Texas law already contained numerous detailed regulations covering abortion facilities, including a requirement that facilities be inspected at least annually. See infra, at 2314 (describing those regulations). The record contains nothing to suggest that H.B. 2 would be more effective than pre-existing Texas law at deterring wrongdoers like Gosnell from criminal behavior.
V
Undue Burden-Surgical-Center Requirement
The second challenged provision of Texas' new law sets forth the surgical-center requirement. Prior to enactment of the new requirement, Texas law required abortion facilities to meet a host of health and safety requirements. Under those pre-existing laws, facilities were subject to annual reporting and recordkeeping requirements, see Tex. Admin. Code, tit. 25, §§ 139.4, 139.5, 139.55, 139.58 ; a quality assurance program, see § 139.8; personnel policies and staffing requirements, see §§ 139.43, 139.46; physical and environmental requirements, see § 139.48; infection control standards, see § 139.49; disclosure requirements, see § 139.50; patient-rights standards, see § 139.51; and medical- and clinical-services standards, see § 139.53, including anesthesia standards, see § 139.59. These requirements are policed by random and announced inspections, at least annually, see §§ 139.23, 139.31; Tex. Health & Safety Code Ann. § 245.006(a) (West 2010), as well as administrative penalties, injunctions, civil penalties, and criminal penalties for certain violations, see Tex. Admin. Code, tit. 25, § 139.33 ; Tex. Health & Safety Code Ann. § 245.011 (criminal penalties for certain reporting violations).
H.B. 2 added the requirement that an "abortion facility" meet the "minimum standards ... for ambulatory surgical centers" under Texas law. § 245.010(a) (West Cum. Supp. 2015). The surgical-center regulations include, among other things, detailed specifications relating to the size of the nursing staff, building dimensions, and other building requirements. The nursing staff must comprise at least "an adequate number of [registered nurses] on duty to meet the following minimum staff requirements: director of the department (or designee), and supervisory and staff personnel for each service area to assure the immediate availability of [a registered nurse] for emergency care or for any patient when needed," Tex. Admin. Code, tit. 25, § 135.15(a)(3) (2016), as well as "a second individual on duty on the premises who is trained and currently certified in basic cardiac life support until all patients have been discharged from the facility" for facilities that provide moderate sedation, such as most abortion facilities, § 135.15(b)(2)(A). Facilities must include a full surgical suite with an operating room that has "a clear floor area of at least 240 square feet" in which "[t]he minimum clear dimension between built-in cabinets, counters, and shelves shall be 14 feet." § 135.52(d)(15)(A). There must be a preoperative patient holding room and a postoperative recovery suite. The former "shall be provided and arranged in a one-way traffic pattern so that patients entering from outside the surgical suite can change, gown, and move directly into the restricted corridor of the surgical suite," § 135.52(d)(10)(A), and the latter "shall be arranged to provide a one-way traffic pattern from the restricted surgical corridor to the postoperative recovery suite, and *2315 then to the extended observation rooms or discharge," § 135.52(d)(9)(A). Surgical centers must meet numerous other spatial requirements, see generally § 135.52, including specific corridor widths, § 135.52(e)(1)(B)(iii). Surgical centers must also have an advanced heating, ventilation, and air conditioning system, § 135.52(g)(5), and must satisfy particular piping system and plumbing requirements, § 135.52(h). Dozens of other sections list additional requirements that apply to surgical centers. See generally §§ 135.1-135.56.
There is considerable evidence in the record supporting the District Court's findings indicating that the statutory provision requiring all abortion facilities to meet all surgical-center standards does not benefit patients and is not necessary. The District Court found that "risks are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to nonsurgical-center facilities." 46 F.Supp.3d, at 684. The court added that women "will not obtain better care or experience more frequent positive outcomes at an ambulatory surgical center as compared to a previously licensed facility." Ibid. And these findings are well supported.
The record makes clear that the surgical-center requirement provides no benefit when complications arise in the context of an abortion produced through medication. That is because, in such a case, complications would almost always arise only after the patient has left the facility. See supra, at 2311 - 2312; App. 278. The record also contains evidence indicating that abortions taking place in an abortion facility are safe-indeed, safer than numerous procedures that take place outside hospitals and to which Texas does not apply its surgical-center requirements. See, e.g., id., at 223-224, 254, 275-279. The total number of deaths in Texas from abortions was five in the period from 2001 to 2012, or about one every two years (that is to say, one out of about 120,000 to 144,000 abortions). Id., at 272. Nationwide, childbirth is 14 times more likely than abortion to result in death, ibid., but Texas law allows a midwife to oversee childbirth in the patient's own home. Colonoscopy, a procedure that typically takes place outside a hospital (or surgical center) setting, has a mortality rate 10 times higher than an abortion. Id ., at 276-277; see ACOG Brief 15 (the mortality rate for liposuction, another outpatient procedure, is 28 times higher than the mortality rate for abortion). Medical treatment after an incomplete miscarriage often involves a procedure identical to that involved in a nonmedical abortion, but it often takes place outside a hospital or surgical center. App. 254; see ACOG Brief 14 (same). And Texas partly or wholly grandfathers (or waives in whole or in part the surgical-center requirement for) about two-thirds of the facilities to which the surgical-center standards apply. But it neither grandfathers nor provides waivers for any of the facilities that perform abortions. 46 F.Supp.3d, at 680-681 ; see App. 184. These facts indicate that the surgical-center provision imposes "a requirement that simply is not based on differences" between abortion and other surgical procedures "that are reasonably related to" preserving women's health, the asserted "purpos[e] of the Act in which it is found." Doe, 410 U.S., at 194, 93 S.Ct. 739 (quoting Morey v. Doud, 354 U.S. 457, 465, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957) ; internal quotation marks omitted).
Moreover, many surgical-center requirements are inappropriate as applied to surgical abortions. Requiring scrub facilities; maintaining a one-way traffic pattern through the facility; having ceiling, wall, and floor finishes; separating soiled utility and sterilization rooms; and regulating air *2316 pressure, filtration, and humidity control can help reduce infection where doctors conduct procedures that penetrate the skin. App. 304. But abortions typically involve either the administration of medicines or procedures performed through the natural opening of the birth canal, which is itself not sterile. See id ., at 302-303. Nor do provisions designed to safeguard heavily sedated patients (unable to help themselves) during fire emergencies, see Tex. Admin. Code, tit. 25, § 135.41 ; App. 304, provide any help to abortion patients, as abortion facilities do not use general anesthesia or deep sedation, id., at 304-305. Further, since the few instances in which serious complications do arise following an abortion almost always require hospitalization, not treatment at a surgical center, id ., at 255-256, surgical-center standards will not help in those instances either.
The upshot is that this record evidence, along with the absence of any evidence to the contrary, provides ample support for the District Court's conclusion that "[m]any of the building standards mandated by the act and its implementing rules have such a tangential relationship to patient safety in the context of abortion as to be nearly arbitrary." 46 F.Supp.3d, at 684. That conclusion, along with the supporting evidence, provides sufficient support for the more general conclusion that the surgical-center requirement "will not [provide] better care or ... more frequent positive outcomes." Ibid. The record evidence thus supports the ultimate legal conclusion that the surgical-center requirement is not necessary.
At the same time, the record provides adequate evidentiary support for the District Court's conclusion that the surgical-center requirement places a substantial obstacle in the path of women seeking an abortion. The parties stipulated that the requirement would further reduce the number of abortion facilities available to seven or eight facilities, located in Houston, Austin, San Antonio, and Dallas/Fort Worth. See App. 182-183. In the District Court's view, the proposition that these "seven or eight providers could meet the demand of the entire State stretches credulity." 46 F.Supp.3d, at 682. We take this statement as a finding that these few facilities could not "meet" that "demand."
The Court of Appeals held that this finding was "clearly erroneous." 790 F.3d, at 590. It wrote that the finding rested upon the " 'ipse dixit ' " of one expert, Dr. Grossman, and that there was no evidence that the current surgical centers (i.e., the seven or eight) are operating at full capacity or could not increase capacity. Ibid. Unlike the Court of Appeals, however, we hold that the record provides adequate support for the District Court's finding.
For one thing, the record contains charts and oral testimony by Dr. Grossman, who said that, as a result of the surgical-center requirement, the number of abortions that the clinics would have to provide would rise from " '14,000 abortions annually' " to " '60,000 to 70,000' "-an increase by a factor of about five. Id., at 589-590. The District Court credited Dr. Grossman as an expert witness. See 46 F.Supp.3d, at 678-679, n. 1 ; id., at 681, n. 4 (finding "indicia of reliability" in Dr. Grossman's conclusions). The Federal Rules of Evidence state that an expert may testify in the "form of an opinion" as long as that opinion rests upon "sufficient facts or data" and "reliable principles and methods." Rule 702. In this case Dr. Grossman's opinion rested upon his participation, along with other university researchers, in research that tracked "the number of open facilities providing abortion care in the state by ... requesting information from the Texas Department of State Health Services ... [, t]hrough interviews *2317 with clinic staff[,] and review of publicly available information." App. 227. The District Court acted within its legal authority in determining that Dr. Grossman's testimony was admissible. See Fed. Rule Evid. 702 ; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("[U]nder the Rules the trial judge must ensure that any and all [expert] evidence admitted is not only relevant, but reliable"); 29 C. Wright & V. Gold, Federal Practice and Procedure: Evidence § 6266, p. 302 (2016) (" Rule 702 impose[s] on the trial judge additional responsibility to determine whether that [expert] testimony is likely to promote accurate factfinding").
For another thing, common sense suggests that, more often than not, a physical facility that satisfies a certain physical demand will not be able to meet five times that demand without expanding or otherwise incurring significant costs. Suppose that we know only that a certain grocery store serves 200 customers per week, that a certain apartment building provides apartments for 200 families, that a certain train station welcomes 200 trains per day. While it is conceivable that the store, the apartment building, or the train station could just as easily provide for 1,000 customers, families, or trains at no significant additional cost, crowding, or delay, most of us would find this possibility highly improbable. The dissent takes issue with this general, intuitive point by arguing that many places operate below capacity and that in any event, facilities could simply hire additional providers. See post, at 2347. We disagree that, according to common sense, medical facilities, well known for their wait times, operate below capacity as a general matter. And the fact that so many facilities were forced to close by the admitting-privileges requirement means that hiring more physicians would not be quite as simple as the dissent suggests. Courts are free to base their findings on commonsense inferences drawn from the evidence. And that is what the District Court did here.
The dissent now seeks to discredit Dr. Grossman by pointing out that a preliminary prediction he made in his testimony in Abbott about the effect of the admitting-privileges requirement on capacity was not borne out after that provision went into effect. See post, at 2346 - 2347, n. 22. If every expert who overestimated or underestimated any figure could not be credited, courts would struggle to find expert assistance. Moreover, making a hypothesis-and then attempting to verify that hypothesis with further studies, as Dr. Grossman did-is not irresponsible. It is an essential element of the scientific method. The District Court's decision to credit Dr. Grossman's testimony was sound, particularly given that Texas provided no credible experts to rebut it. See 46 F.Supp.3d, at 680, n. 3 (declining to credit Texas' expert witnesses, in part because Vincent Rue, a nonphysician consultant for Texas, had exercised "considerable editorial and discretionary control over the contents of the experts' reports").
Texas suggests that the seven or eight remaining clinics could expand sufficiently to provide abortions for the 60,000 to 72,000 Texas women who sought them each year. Because petitioners had satisfied their burden, the obligation was on Texas, if it could, to present evidence rebutting that issue to the District Court. Texas admitted that it presented no such evidence. Tr. of Oral Arg. 46. Instead, Texas argued before this Court that one new clinic now serves 9,000 women annually. Ibid. In addition to being outside the record, that example is not representative. The clinic to which Texas referred apparently cost $26 million to construct-a fact *2318 that even more clearly demonstrates that requiring seven or eight clinics to serve five times their usual number of patients does indeed represent an undue burden on abortion access. See Planned Parenthood Debuts New Building: Its $26 Million Center in Houston is Largest of Its Kind in U.S., Houston Chronicle, May 21, 2010, p. B1.
Attempting to provide the evidence that Texas did not, the dissent points to an exhibit submitted in Abbott showing that three Texas surgical centers, two in Dallas as well as the $26-million facility in Houston, are each capable of serving an average of 7,000 patients per year. See post, at 2347 - 2349. That "average" is misleading. In addition to including the Houston clinic, which does not represent most facilities, it is underinclusive. It ignores the evidence as to the Whole Woman's Health surgical-center facility in San Antonio, the capacity of which is described as "severely limited." The exhibit does nothing to rebut the commonsense inference that the dramatic decline in the number of available facilities will cause a shortfall in capacity should H.B. 2 go into effect. And facilities that were still operating after the effective date of the admitting-privileges provision were not able to accommodate increased demand. See App. 238; Tr. of Oral Arg. 30-31; Brief for National Abortion Federation et al. as Amici Curiae 17-20 (citing clinics' experiences since the admitting-privileges requirement went into effect of 3-week wait times, staff burnout, and waiting rooms so full, patients had to sit on the floor or wait outside).
More fundamentally, in the face of no threat to women's health, Texas seeks to force women to travel long distances to get abortions in crammed-to-capacity superfacilities. Patients seeking these services are less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered. Healthcare facilities and medical professionals are not fungible commodities. Surgical centers attempting to accommodate sudden, vastly increased demand, see 46 F.Supp.3d, at 682, may find that quality of care declines. Another commonsense inference that the District Court made is that these effects would be harmful to, not supportive of, women's health. See id., at 682-683.
Finally, the District Court found that the costs that a currently licensed abortion facility would have to incur to meet the surgical-center requirements were considerable, ranging from $1 million per facility (for facilities with adequate space) to $3 million per facility (where additional land must be purchased). Id ., at 682. This evidence supports the conclusion that more surgical centers will not soon fill the gap when licensed facilities are forced to close.
We agree with the District Court that the surgical-center requirement, like the admitting-privileges requirement, provides few, if any, health benefits for women, poses a substantial obstacle to women seeking abortions, and constitutes an "undue burden" on their constitutional right to do so.
VI
We consider three additional arguments that Texas makes and deem none persuasive.
First, Texas argues that facial invalidation of both challenged provisions is precluded by H.B. 2's severability clause. See Brief for Respondents 50-52. The severability clause says that "every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provision in this Act, are severable from each other." H.B. 2, *2319 § 10(b), App. to Pet. for Cert. 200a. It further provides that if "any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." Ibid. That language, Texas argues, means that facial invalidation of parts of the statute is not an option; instead, it says, the severability clause mandates a more narrowly tailored judicial remedy. But the challenged provisions of H.B. 2 close most of the abortion facilities in Texas and place added stress on those facilities able to remain open. They vastly increase the obstacles confronting women seeking abortions in Texas without providing any benefit to women's health capable of withstanding any meaningful scrutiny. The provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion.
Severability clauses, it is true, do express the enacting legislature's preference for a narrow judicial remedy. As a general matter, we attempt to honor that preference. But our cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision. "We have held that a severability clause is an aid merely; not an inexorable command." Reno v. American Civil Liberties Union, 521 U.S. 844, 884-885, n. 49, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (internal quotation marks omitted). Indeed, if a severability clause could impose such a requirement on courts, legislatures would easily be able to insulate unconstitutional statutes from most facial review. See ibid. ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government" (internal quotation marks omitted)). A severability clause is not grounds for a court to "devise a judicial remedy that ... entail[s] quintessentially legislative work." Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). Such an approach would inflict enormous costs on both courts and litigants, who would be required to proceed in this manner whenever a single application of a law might be valid. We reject Texas' invitation to pave the way for legislatures to immunize their statutes from facial review.
Texas similarly argues that instead of finding the entire surgical-center provision unconstitutional, we should invalidate (as applied to abortion clinics) only those specific surgical-center regulations that unduly burden the provision of abortions, while leaving in place other surgical-center regulations (for example, the reader could pick any of the various examples provided by the dissent, see post, at 2352 - 2353). See Brief for Respondents 52-53. As we have explained, Texas' attempt to broadly draft a requirement to sever "applications" does not require us to proceed in piecemeal fashion when we have found the statutory provisions at issue facially unconstitutional.
Nor is that approach to the regulations even required by H.B. 2 itself. The statute was meant to require abortion facilities to meet the integrated surgical-center standards-not some subset thereof. The severability clause refers to severing applications of words and phrases in the Act, such as the surgical-center requirement as a whole. See H.B. 2, § 4, App. to Pet. for Cert. 194a. It does not say that courts should go through the individual components *2320 of the different, surgical-center statute, let alone the individual regulations governing surgical centers to see whether those requirements are severable from each other as applied to abortion facilities. Facilities subject to some subset of those regulations do not qualify as surgical centers. And the risk of harm caused by inconsistent application of only a fraction of interconnected regulations counsels against doing so.
Second, Texas claims that the provisions at issue here do not impose a substantial obstacle because the women affected by those laws are not a "large fraction" of Texan women "of reproductive age," which Texas reads Casey to have required. See Brief for Respondents 45, 48. But Casey used the language "large fraction" to refer to "a large fraction of cases in which [the provision at issue] is relevant, " a class narrower than "all women," "pregnant women," or even "the class of women seeking abortions identified by the State." 505 U.S., at 894-895, 112 S.Ct. 2791 (opinion of the Court) (emphasis added). Here, as in Casey, the relevant denominator is "those [women] for whom [the provision] is an actual rather than an irrelevant restriction." Id ., at 895, 112 S.Ct. 2791.
Third, Texas looks for support to Simopoulos v. Virginia, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983), a case in which this Court upheld a surgical-center requirement as applied to second-trimester abortions. This case, however, unlike Simopoulos, involves restrictions applicable to all abortions, not simply to those that take place during the second trimester. Most abortions in Texas occur in the first trimester, not the second. App. 236. More importantly, in Casey we discarded the trimester framework, and we now use "viability" as the relevant point at which a State may begin limiting women's access to abortion for reasons unrelated to maternal health. 505 U.S., at 878, 112 S.Ct. 2791 (plurality opinion). Because the second trimester includes time that is both previability and postviability, Simopoulos cannot provide clear guidance. Further, the Court in Simopoulos found that the petitioner in that case, unlike petitioners here, had waived any argument that the regulation did not significantly help protect women's health. 462 U.S., at 517, 103 S.Ct. 2532.
* * *
For these reasons the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.