In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-2051

WHOLE WOMAN'S HEALTH ALLIANCE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

CURTIS T. HILL, JR., *et al.*, in his official capacity as Attorney General of the State of Indiana, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01904-SEB-MJD — **Sarah Evans Barker**, *Judge*.

ARGUED JULY 11, 2019 — DECIDED AUGUST 22, 2019

Before WOOD, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

WOOD, *Chief Judge*. Indiana, like many states, has an elaborate network of laws regulating abortion care. The present appeal presents a narrow question: is one provider entitled to a preliminary injunction against one part of those laws, as it relates to one clinic in one city? More will come along later, as the district court proceeds to resolve the underlying case, in

which plaintiffs have asserted more broadly that various aspects of Indiana's abortion regime violate the Fourteenth Amendment's Due Process and Equal Protection Clauses. But the merits stage of the case is still in its infancy.

The provider now before us is Whole Woman's Health Alliance ("the Alliance"). It is having trouble complying with Indiana's abortion laws, despite its attempts to do so. The Alliance has for the past two years been unable to obtain a license from the Indiana State Department of Health ("the Department"). It needs such a license in order to open a clinic that exclusively provides medication abortion care in South Bend, Indiana. After almost two years, two unsuccessful applications, a statutory amendment to relevant definitions, and a moving target of wide-ranging requests for information, the Alliance concluded that its attempts were futile and turned to the federal court for assistance. It filed a motion for a preliminary injunction that would exempt it from the licensing requirement, thereby allowing it to provide care at the South Bend clinic while the case proceeds.

The district court granted the requested preliminary relief. It held that the Alliance has shown a likelihood of success on the merits of its claim that Indiana's requirement of licensure for clinics that provide only medication abortions (that is, those induced exclusively by taking pills), as applied to the South Bend clinic, violates both the Due Process and the Equal Protection Clauses of the Fourteenth Amendment. The state has taken an interlocutory appeal asking us to lift that injunction. See 28 U.S.C. § 1292(a)(1). While that appeal has been pending, we issued an order narrowing the scope of the district court's injunction, and we heard oral argument on the question whether the preliminary injunction should be stayed

immediately. Briefing has been proceeding apace in the main appeal from the injunction, but we conclude that we now have enough before us to resolve that appeal as well as the narrower stay issue we considered at argument.

We hold that the district court's broad condemnation of Indiana's licensing scheme runs contrary to Supreme Court precedent. While this litigation is pending, the state may for the most part administer that system in the ordinary course. Nonetheless, we have concerns about the state's handling of the Alliance's license application. Indiana may use licensing as a legitimate means of vetting and monitoring providers. To the extent that Indiana is using its licensing scheme to prevent the South Bend clinic from opening simply to block access to pre-viability abortions, rather than as a legitimate means of vetting and monitoring providers, it is acting unconstitutionally. We therefore order the district court to modify the injunction to instruct Indiana to treat the Alliance's South Bend facility as though it were provisionally licensed. This respects the state's interest in regulating medical facilities, while at the same time it allows the Alliance to keep providing medication abortions at its South Bend clinic while the case proceeds.

As the district court develops the record in this case, it may continue to examine whether the state has proceeded in good faith in its handling of the Alliance's license application, or if instead the apparently ever-changing requirements mask a decision to deny all such licenses. This inquiry includes but is not limited to whether the Department's conduct was a sincere attempt to ensure that the Alliance is a qualified provider that meets the requirements for a license, or pretext for an unconstitutional action.

**I**

South Bend, Indiana, is the state's fourth largest city; the metropolitan area in which it is located has a population of about 320,000.[1] (See U.S. Census, Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2018, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview .xhtml?pid=PEP_2018_PEPANNRES&src=pt (click "Add/Remove Geographies"; search location field for "South Bend-Mishawaka, IN-MI Metro Area"; click "Show Table")) (last visited Aug. 19, 2019). It is home to several colleges and universities, including world-renowned University of Notre Dame du Lac, and St. Mary's College, a Catholic women's private liberal arts institution. The nearest abortion clinic is in Merrillville, Indiana, 65 miles away. Other Indiana clinics exist in Lafayette (106 miles away), Indianapolis (150 miles away) and Bloomington (199 miles away).[2] Public transportation is not a realistic option for travel between South Bend and Merrillville (or any of the other cities with an abortion clinic).

---

[1] We take our account of the facts from the district court's findings on the motion for preliminary injunction, unless otherwise noted. Many of them are, of necessity, subject to change, depending on what the final record shows.

[2] To the extent it may be relevant (and that may be not at all), the distance between South Bend and Chicago is about 95 miles. This is therefore not a case in which someone could drive five miles across a state line to obtain access to abortion care, assuming that out-of-state care is possible under the person's insurance plan. We note as well that we have rejected the proposition that "the harm to a constitutional right [can be] measured by the extent to which it can be exercised in another jurisdiction." See *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 918 (7th Cir. 2015), quoting from *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011).

Women in the South Bend area therefore must arrange for private transportation—either twice or coupled with lodging arrangements—because Indiana requires women to wait 18 hours between first seeing their doctor and then receiving an abortion. The absence of a South Bend clinic thus makes access to abortion care more costly because of the increased time, money, and social isolation experienced by low-income women who live in northern Indiana. According to evidence presented to the district court, the travel and time costs led some women to skip bills, pawn belongings, or take out payday loans to cover the costs of abortion care, including not just the medical fees, but also the costs of transportation and lodgings. Patients often must travel alone, because of their own financial limitations or those of their families and friends, as well as for privacy reasons.

## A

In Indiana, as in other states, one does not simply open the doors of a clinic that provides abortion care without further ado. Instead, the state for many years has had a licensing regime. Indiana Code § 16-21-2-10 provides that a person "must obtain a license" from the Indiana Department of Health "before establishing, conducting, operating, or maintaining … an abortion clinic." The licensing requirement initially applied only to clinics that offered surgical abortions, but in 2013 (and later in 2015 to address problems with the first version) Indiana amended its code to require licenses for medication-only clinics. See Abortion—Drugs and Medicine, 2013 Ind. Legis. Serv. P.L. 136-2013 (S.E.A. 371) (WEST); Health and Sanitation—Health Care Providers—Abortion, 2015 Ind. Legis. Serv. P.L. 92-2015 (S.E.A. 546) (WEST) (codified at IND. CODE § 16-18-2-1.5(a)).

Indiana's licensing regime imposes several requirements on abortion clinics. Two are pertinent here: first, an applicant must show that it is "of reputable and responsible character"; second, it must "[d]isclose whether the applicant, or an owner or affiliate of the applicant, operated an abortion clinic that was closed as a direct result of patient health and safety concerns." It must include "administrative and legal documentation," "inspection reports," and "violation remediation contracts" related to any such disclosures. IND. CODE § 16-21-2-11(a), (d).

The Department has also promulgated administrative regulations to implement the licensing system. Those regulations state that the Department may deny a license for a variety of reasons, including because the applicant lacks "reputable or responsible character" or if its "application for a license to operate an abortion clinic or supporting documentation provided inaccurate statements or information." 410 IND. ADMIN. CODE § 26-2-5(1), (7).

B

In 2014 the Alliance began studying the possibility of opening a clinic in South Bend. On August 11, 2017, it filed a formal application to open a South Bend clinic exclusively for medication abortions, *i.e.* those effected through two drugs, mifepristone and misoprostol. Mifepristone is approved by the federal Food and Drug Administration (FDA) for abortions up to 70 days after the woman's last menstrual period; misoprostol is FDA-approved for the same early-term abortions, although the first use listed for it relates to ulcer prevention. See WebMD, Mifepristone 200 Mg Tablet Abortifacients, https://www.webmd.com/drugs/2/drug-20222/mifepristone-oral (last visited Aug. 20, 2019);

WebMD, Misoprostol, https://www.webmd.com/drugs/2/ drug-6111/misoprostol-oral/details (last visited Aug. 20, 2019). Medication abortions rarely give rise to complications: the district court cited one study of more than 230,000 patients, who experienced a complication rate of 0.65 percent. Complications requiring hospital admission occurred in only 0.06 percent of cases; those needing emergency-room treatment accounted for 0.10 percent. Taking a cautious path, however, the FDA has authorized mifepristone and misoprostol for abortions only if the pills are given to the patient directly by a doctor; doctors may not write a prescription for a pharmacy to fill. The FDA has also authorized the use of these drugs, in the identical dosages and given in the same order, for the treatment of miscarriages.

The Alliance amended its application on October 6, 2017, to cure several minor problems that a Department representative had identified. But that was only the beginning. Trent Fox, the Department's chief of staff, testified that the Alliance's application raised a few red flags for him. The Alliance was a new entity to the state. Fox had heard that a clinic administrator with ties to the Alliance had a connection to a doctor who surrendered his abortion-clinic license and lost his medical license. The Department also received letters from some Indiana state senators who indicated that they had received messages from constituents alleging health violations at Whole Woman's Health clinics throughout the country. The letters reminded the Department of Indiana's preference for "pro-life" policies. In response to these complaints, Fox turned to the internet. There he found a website, not for the Alliance, but instead for an entity with the similar name Whole Woman's Health LLC. The website had a list of "Our Clinics" that included the hoped-for South

Bend clinic and eight other clinics across the country with the name "Whole Woman's Health." In its application, the Alliance had stated that none of its affiliates had ever closed as a direct result of patient health and safety concerns, and so it disclosed no further information about any incidents.

On October 27, 2017, the Department sent a second request to the Alliance for additional information about its application. It asked specifically for a "complete ownership structure" for the Alliance including "parent, affiliate or subsidiary organizations," and a list of "all the abortion and health care facilities currently operated by the applicant, including its parent, affiliate, or subsidiary organizations." At the time, "affiliate" was not defined in the statute, and, as Fox knew, the Indiana code contained several different definitions. But the Department offered the Alliance no guidance on what it meant by "affiliate." Indiana has characterized this omission as an intentional investigative technique designed to see whether the Alliance would disclose the other clinics that used the name "Whole Woman's Health."

In fact, much depended on what was meant by "affiliate." The Alliance is a Texas 501(c)(3) nonprofit corporation that owns and operates two other abortion clinics in Virginia and Texas. The Alliance's president, CEO, and chair of the governing board of directors is Amy Hagstrom Miller. Before Hagstrom Miller founded the Alliance, she ran Whole Woman's Health LLC (WWH), which is a separate for-profit company. WWH is not a clinic of any kind. It is instead an administrative organization that contracts with different abortion care providers, including the Alliance, for the provision of various business services such as bookkeeping, human resources, regulatory compliance, public relations, and

marketing. Throughout the country there are other for-profit LLCs that run abortion clinics under the name "Whole Woman's Health." Those clinics also contract with WWH for similar services. They are owned by another entity, which is in turn owned by Hagstrom Miller. Hagstrom Miller describes this network as a "consortium," though it appears that the organizations are united primarily by their common name, relationship to WWH as a provider of business services, and relationship with Hagstrom Miller.

On December 8, 2017, the Alliance responded to the October 27 request by identifying and explaining the structure of the Alliance and its two other clinics. It said nothing about WWH or any of the other LLCs that use the name "Whole Woman's Health" and contract with WWH for business services. The Department found this to be a disingenuous response. On January 3, 2018, it sent a letter charging the Alliance with "fail[ing] to disclose, conceal[ing], or otherwise omitt[ing] information related to additional clinics." It accordingly denied the application based on the conclusion that the Alliance "fail[ed] to meet the requirement that the Applicant is of reputable and responsible character and the supporting documentation provided inaccurate statements or information."

C

The Alliance filed an administrative appeal from that decision on January 22, 2018. It argued that the Alliance is a separate nonprofit entity and therefore was not under any obligation to disclose any information about the independently run WWH business-services company or other clinics around the country using the name Whole Woman's Health. An administrative law judge (ALJ) heard the appeal

over two days in August 2018. There was extensive testimony about the Alliance, WWH, Hagstrom Miller, the license application, and the Department's review. The Department contended that Hagstrom Miller ultimately controls all of these organizations, if not enough to make their separation a legal fiction, at least enough to make them "affiliates."

On September 14, 2018, the ALJ rejected the Department's position. She held that "no evidence provided during the proceedings … [suggests that the Alliance's responses] were inaccurate, incomplete or misleading. The Alliance demonstrated by a preponderance of the evidence that their responses … were complete and accurate." Indeed, the ALJ faulted the Department for a lack of diligence, noting that it said nothing to the Alliance about the specific concerns it had based on the senators' letters or its own "informal investigation" on the internet. The ALJ concluded that the Department failed to show by a preponderance of the evidence that the Alliance lacked the requisite character for a license, and recommended granting the license.

The Department appealed the ALJ's proposed order to its three-member Appeals Panel. By a two-to-one vote, on December 18, 2018, the Panel agreed with the Department that Hagstrom Miller "controls" all of these entities, thus making them "affiliates." The Panel reasoned that although neither "control" nor "affiliate" was specifically defined under Indiana law, an Indiana intermediate appellate court had adopted a definition the panel found useful in *Combs v. Daniels*, 853 N.E.2d 156 (Ind. Ct. App. 2006). *Combs* was a suit brought by several students in a state-operated special needs school, which the state had decided to shut down. Among

other things, the plaintiffs argued that the state's power under the governing statutes to "administer" the school did not include the power to close it altogether. The court rejected this point, and in that context had this to say: "The statute gives unfettered control over the administration of [the school]. The plain meaning of 'control' is 'the power or authority to manage, superintend, restrict, regulate, direct, govern, administer, or oversee,' as well as the power to restrain, check, or regulate." *Id.* at 161. The case thus had nothing to do with the licensing of health-care facilities, let alone abortion clinics. It is not terribly surprising that the Alliance did not realize that this was the definition the state wanted to adopt.

In the end, the Appeals Panel did not rest its conclusion on any finding about the Alliance's character. It decided only that, based on the *Combs* understanding of affiliate (one that no one at the time of the request for information had called to the Alliance's attention), the Alliance had provided inaccurate statements to the Department. For that reason its application failed. See 410 IND. ADM. CODE § 26-2-5(7).

While this appeal was underway, the Indiana legislature amended the licensing law on March 25, 2018, to provide a definition of "affiliate." The new definition tracks the direct or indirect "common control" definition that Indiana had urged in its arguments in the Alliance's administrative appeal. The amendment took effect on July 1, 2018, almost a year after the Alliance filed its application for a license. See 2018 Ind. Legis. Serv. P.L. 205-2018 (S.E.A. 340) (WEST) (codified at IND. CODE § 16-18-2-9.4).

At the state's urging, the Alliance gave up the fight over its initial disclosures and submitted a new application for a

license on January 19, 2019. This time, with the benefit of the
new definition, the Alliance conceded that WWH and the
other Whole Woman's Health clinics throughout the country
were "affiliates." It asserted, however, that neither the Alli-
ance nor any of its affiliates operated an abortion clinic that
had been closed on account of patient health and safety con-
cerns. In support of that statement, it attached a declaration
from Hagstrom Miller averring—under penalty of perjury—
that none of the Alliance's or WWH's clinics has been denied
a license. The only potential exception to that track record,
Hagstrom Miller said, was one instance in which a Texas
clinic's license was revoked based on an erroneous inspection
finding. Hagstrom Miller furnished the pertinent documents
from the Texas Department of State Health Services concern-
ing that incident. Those documents confirm that the license
was restored eight days after its revocation. While the records
do not confirm that the initial findings were erroneous, they
do verify that all health and safety concerns were resolved
within that short period.

This was not enough for the Department. It responded
with a new and greatly expanded request for information, in-
cluding "copies of all reports, complaints, forms, correspond-
ence, and other documents that concern, mention, or relate to
any investigation, inspection, or survey of the affiliate by any
state or other regulatory authorities at any time since and in-
cluding January 1, 2014." It asked for similarly broad docu-
ments concerning affiliate license applications; administrative
enforcement actions; and administrative, civil, or criminal
court actions involving all affiliates. The Alliance responded
to this request by objecting that it was "exceptionally broad
and burdensome." At that point, the administrative process

ground to a halt: the Department never responded to the ob-
jection either by defending the scope of its request or by offer-
ing to discuss more tailored discovery. To date, the Depart-
ment has neither granted nor denied the second license appli-
cation.

D

Faced with this stalemate, the Alliance turned to this law-
suit. The complaint presents a broadside attack on Indiana's
abortion laws, charging that those laws violate the Constitu-
tion in various respects. We need not delve into those allega-
tions, however, because the rest of those claims remain in the
early stages of discovery. The state initially sought to dismiss
the case by claiming that the Alliance lacked standing because
it was not yet operating a clinic in Indiana. The Alliance re-
sponded with a motion for a preliminary injunction.

Our concern is only with the disposition of that motion.
The relief the Alliance requested is narrow: it wanted to be
allowed to open the South Bend clinic and provide medica-
tion abortion care there while the case proceeds. Importantly
for this interlocutory appeal, the Alliance represents that its
request would not otherwise affect the Indiana licensing law
beyond clearing the way for the Alliance to open its South
Bend clinic for that limited purpose.

The district court granted the Alliance's motion, after find-
ing that it had satisfied the criteria for preliminary relief, in-
cluding by showing a likelihood of success on the merits. The
district court supported that finding in two ways. First, it
found that the licensing law's classifications offend the Equal
Protection Clause insofar as they treat the class of women
seeking these medications for abortion purposes differently

from the way they treat the class of women who seek the identical medications, in the identical doses, for purposes of resolving a miscarriage. Second, it found that the entire licensing scheme as applied to the Alliance's South Bend clinic unduly burdens the right of women in northern Indiana to obtain access to abortion care. The district court found that the burden on access to abortion care for women in northern Indiana greatly outweighed any "slight" benefits Indiana might derive from any "*further*" inquiry into the Alliance's application. It also described as "slight" the benefits the state would derive from its licensing regime, given the other regulatory tools available to it. Finally, the court found the evidence the Department had for doubting the Alliance's character unpersuasive. In so ruling, the district court relied primarily on *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

The district court's original injunction reads as follows:

Defendants are ENJOINED from enforcing the provisions of Indiana Code § 16-21-2-2(4) (requiring Department to license); Indiana Code § 16-21-2-2.5(b) (penalty for unlicensed operation); and Indiana Code § 16-21-2-10 (necessity of license) against [the Alliance] with respect to the South Bend Clinic.

The state filed an interlocutory appeal from that injunction. See 28 U.S.C. § 1292(a)(1). It also filed a motion to stay the injunction pending its appeal, first with the district court, which denied the stay motion, and then with this court. In response to the stay motion, we concluded that "the injunction as written is overbroad, as it purports to deal with the operation of Indiana's licensing scheme as a whole." We thus took

"the immediate step of narrowing the injunction to one against only the inclusion of facilities that provide medical abortions … and only with respect to the proposed clinic in South Bend." With the benefit of supplemental briefs, we then heard oral argument on the stay motion.

We conclude that, as further narrowed by this opinion, the preliminary injunction issued by the district court should stay in place. Understanding the preliminary nature of this record, we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 269 (7th Cir. 2009).

## II

State licensing regimes are ubiquitous. There are professional licenses for everyone from barbers, hairdressers, and real estate brokers to teachers, funeral directors, and blackjack dealers. Generally speaking, those regimes fall comfortably within the state's police power; only rarely do they impinge on citizens' fundamental constitutional rights. A person has the right to the counsel of her choice, for example, but her choice is limited to licensed attorneys. It is no surprise, then, that the Supreme Court has recognized that states may require licenses of abortion care providers. After all, abortion care providers provide a form of health care, which is a field that is heavily licensed and regulated by the state.

The Court's recognition of the state's power to license abortion care providers stretches back to *Roe v. Wade*'s companion case, *Doe v. Bolton*, 410 U.S. 179, 200–01 (1973). The appellant in *Bolton* did not challenge the state's requirement that abortions be provided only by licensed physicians. The Court confirmed the legitimacy of that type of restriction in later

cases. In *Simopoulos v. Virginia*, 462 U.S. 506 (1983), it held that a state could require second-trimester abortions to be performed in licensed clinics, because it was "not an unreasonable means of furthering the State's compelling interest in 'protecting the woman's own health and safety.'" *Id.* at 519 (quoting *Roe v. Wade*, 410 U.S. 113, 150 (1973)). *Casey* expanded on this point. 505 U.S. at 885. There the Court said that "[o]ur cases reflect the fact that the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others." *Id.* By the mid-1990s, the proposition that a state may require only licensed physicians to perform an abortion was so well established that a lower court's contrary conclusion merited summary reversal. See *Mazurek v. Armstrong*, 520 U.S. 968, 973–74 (1997).

It is therefore uncontroversial to say that a state may require an abortion to be performed in a licensed clinic or by a licensed professional. But to say that a state may require a license does not mean that every licensing regime, no matter how burdensome or arbitrary, passes constitutional muster. That has been clear since *Bolton*, where the Court struck down Georgia's requirement that every hospital at which an abortion is performed be accredited by the Joint Commission on Accreditation of Hospitals ("JCAH"). 410 U.S. at 194–95. While the Court recognized that Georgia could "adopt standards for licensing all facilities where abortions may be performed," those standards must be "legitimately related to the objective the State seeks to accomplish." *Id.* In that instance, JCAH accreditation was an unnecessary extra hurdle given that there was no evidence "that only the full resources of a

licensed hospital, rather than those of some other appropriately licensed institution, satisfy [Georgia's professed] health interests." *Id.* at 195. The Court reaffirmed this limitation in *Simopoulos*, stating that the state's "discretion does not permit it to adopt abortion regulations that depart from accepted medical practice." 462 U.S. at 516. We take the following message from those cases: to the extent that Indiana's licensing statute falls within "accepted medical practice[s]" and is "legitimately related" to the state's interests in women's health and fetal life, it passes constitutional muster.

The district court strayed from this guidance when it decided that Indiana's *entire* licensing scheme was unconstitutional. Indeed, most of Indiana's licensing statutes appear inoffensive. For example, its requirements that licensees must meet minimum "[s]anitation standards," have "[n]ecessary emergency equipment" and "[p]rocedures to monitor patients after the administration of anesthesia [and] … provide follow-up care for patient complications," are all well within the realm of accepted regulations of medical practices. See IND. CODE § 16-21-2-2.5(a)(2). Even Indiana's requirement that licensees have "reputable and responsible character" is nothing unusual or suspect. IND. CODE § 16-21-2-11(a)(1). That requirement is mirrored by the character and fitness requirement administered by every state bar in the country. See, *e.g.*, *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154 (1971) (upholding the constitutionality of New York's character and fitness requirement for attorneys). Consequently, to the extent the district court viewed Indiana's licensing scheme as unconstitutional because licensing provided insufficient benefits to the state as a general matter, that conclusion cannot stand.

But there is a critical difference between a facial challenge to a statute's text, and an as-applied challenge to a statute's implementation. Here we deal with the latter. We thus turn now to the state's handling of the Alliance's application.

**III**

To prove it is entitled to a preliminary injunction, the Alliance must "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court found as a fact that refusing to allow the South Bend clinic to open as a medication-abortion only facility (or now, closing it down, as it has been operating since the preliminary injunction took effect) amounts to an irreparable constitutional harm that is both "significant and obvious," and without remedy at law. Enforcing a constitutional right is in the public interest. For present purposes, we therefore focus on the "likelihood of success" requirement. This requires us to consider in more detail the question whether the state's administration of the licensing requirement has centered on legitimate questions about the Alliance's ability to meet valid criteria, or if it has been a pretextual exercise designed solely to block any kind of abortion facility in South Bend.

There is no doubt that a "state has a legitimate interest in seeing to it that abortion … is performed under circumstances that insure maximum safety for the patient." *Roe*, 410 U.S. at 150. The state likewise has a "legitimate interest in protecting the potentiality of human life. These interests are separate and distinct." *Id.* at 162. No matter how valid those interests may

be, however, "[w]here state regulation imposes an undue burden on a woman's ability to make th[e] decision [to terminate her pregnancy] … the power of the State reach[es] into the heart of the liberty protected by the Due Process Clause." *Casey*, 505 U.S. at 874. The Alliance contends that at some point during its efforts to obtain a license, the Department's actions crossed the constitutional line. What may have started as a reasonable request for information relevant to state concerns for patient safety and fetal life ultimately became, it argues, an undue burden on the right of South Bend-area women to obtain an abortion.

"A finding of an undue burden is a shorthand for the conclusion that a state regulation has the *purpose or effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877 (emphasis added). Unconstitutional means as well as ends violate the Due Process Clause.

> "A statute with this *purpose* is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the *effect* of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."

*Id*. (emphasis added). *Casey*'s command is straightforward: placing a substantial obstacle in the path of a woman seeking a pre-viability abortion cannot be the means of accomplishing another legitimate state interest, nor can it be the real purpose of a state action. The undue-burden standard thus prohibits a

state from preventing access to abortions even if it does so in pursuit of some other legitimate goal.

In *Hellerstedt*, the Supreme Court reaffirmed this core holding from *Casey* and provided the framework for how to determine whether a state action has unduly burdened access to abortion care either in purpose or effect. The Court stated that the undue-burden inquiry requires a holistic, rigorous, and independent judicial examination of the facts of a case to determine whether the burdens are undue in light of the benefits the state is permitted to pursue. 136 S. Ct. at 2311. In other words, we are instructed to use a balancing test, with careful heed to the record. *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 896 F.3d 809, 818 (7th Cir. 2018) (citing *Hellerstedt*, 136 S. Ct. at 2310) ("Not only does *Whole Woman's Health* confirm that courts must apply the undue burden balancing test of *Casey* to all abortion regulations, it also dictates how that test ought to be applied. … The proper standard is for courts to consider the evidence in the record.").

The *Hellerstedt* Court also explained the importance of the judiciary's role when invidious state purposes are alleged. 136 S. Ct. at 2309. The Court explicitly rejected the idea that a state is entitled to rational-basis-style deference in this setting. *Id.* at 2309–10. Instead, "courts [must] consider whether any burden imposed on abortion access is 'undue'" by "plac[ing] considerable weight upon evidence and argument presented in judicial proceedings." *Id.* at 2310. "[W]here constitutional rights are at stake … [u]ncritical deference to Congress' factual findings ... is inappropriate." *Id.* (quoting *Gonzales v. Carhart*, 550 U.S. 124, 165–66 (2007)). Courts are required not only to scrutinize the reasons given for a state action, but also the

evidence provided by the state supporting its action. When the state burdens a constitutional right, it must have a constitutionally permissible reason. If the evidence does not support the state's proffered reason, or it reveals instead an impermissible reason, the state law cannot stand.

This conclusion flows from the more general proposition that the Constitution does not tolerate pretext that covers up unconstitutional motives. "[It] is plain, [that] … [a]n official action, … taken for the purpose of [violating constitutional rights] has no legitimacy at all under our Constitution." *City of Richmond, Virginia v. United States*, 422 U.S. 358, 378 (1975) (remanding for further proceedings with respect to unconstitutional discriminatory purpose). In the realm of constitutionally protected rights, purpose matters. "Acts generally lawful may become unlawful when done to accomplish an unlawful end." *Id.* at 379 (quoting *W. Union Tel. Co. v. Foster*, 247 U.S. 105, 114 (1918)). A purposeful state effort to undermine a constitutionally protected liberty interest is incompatible with the Constitution. *Casey* prohibits state actions that "serve no purpose other than to make abortions more difficult." *Casey*, 505 U.S. at 901.

*Hellerstedt*'s approach to pretext is instructive. The Court focused on inconsistencies between the purported legitimate state interest in women's health and the evidence in the record of the state's (there, Texas's) actions. It found that the "facts indicate[d] that the surgical-center provision imposes a requirement that simply is not based on differences between abortion and other surgical procedures that are reasonably related to preserving women's health, the asserted purpos[e] of the Act in which it is found." 136 S. Ct. at 2315 (cleaned up). This revealing mismatch, combined with further evidence of

an incongruence between the law's requirements and the circumstances of abortion clinics, was key to the Court's benefits analysis. It led to the conclusion that the challenged law did not serve the legitimate purpose of protecting women's health and thus was "not necessary." *Id.* at 2316. By refusing to defer to a state's purported justifications, and instead carefully evaluating the facts, the Court ensured that in conducting its balancing analysis, pretextual purposes do not receive any weight on the "benefits" side of the ledger.

## IV

*Hellerstedt* thus instructs us to scrutinize the facts rigorously, in order to determine what the Department was doing with the Alliance's license application over the past two years. The record before us paints a troubling picture. A seemingly endless cycle of demands for information, responses, and new demands does not suggest a *bona fide* process. At some point, enough is enough. As courts throughout the nation recognize every day in resolving litigation discovery disputes, there comes a point where record requests become so duplicative, or marginally (if at all) relevant, that they are nothing but harassment.

Indiana's most recent requests are particularly concerning. Indiana has a declaration from Hagstrom Miller, made under penalty of perjury, that none of the WWH or Alliance clinics has had trouble obtaining or keeping licenses. Nonetheless, the state's document requests refuse to take her at her word and demand voluminous proof from those organizations' internal files directly. This strikes us as the equivalent of asking if you have ever had a speeding ticket, and instead of accepting a sworn affidavit, asking you to go to all 50 states, the District of Columbia, and the 14 U.S. territories (or why

not all 195 countries in the world?) and obtain certifications from each confirming that you have not. There is no need for such scorched-earth tactics. Indiana is entitled to protect patient safety and fetal life through its licensing scheme, but if it is doing little more than throwing up one hurdle after another in an effort to keep the Alliance's doors closed, it has gone beyond constitutional boundaries.

Looking at the considerable record it was able to assemble, the district court concluded that Indiana had not adequately justified the actions described above and that the absence of a clinic in South Bend would have the effect of imposing a "substantial obstacle in the path of northern Indiana women." In addition to the documentation submitted in support of the Alliance's two license applications for the South Bend facility, the hearing before the ALJ and the appeal of the first decision yielded a great deal of information. In its May 25, 2018 filings alone, the Alliance answered 18 interrogatories and included 64 separate exhibits. These submissions not only covered the history and structure of the Alliance, but also WWH and its relationship with other Whole Woman's Health-branded clinics throughout the country. And that was not all. As we have noted a couple of times, Hagstrom Miller submitted a sworn declaration with the amended license attesting that none of the Alliance's or any other Whole Woman's Health clinic has been denied a license, and that the one instance where a Texas clinic's license was revoked was based on an erroneous finding and the license was reinstated in just eight days.

For purposes of this preliminary injunction, we see no clear error in the district court's conclusion that Indiana has not given the Alliance's license application a fair shake. Indiana argues that the evidence in this record demonstrates that

its actions were all based on constitutionally permissible con-
cerns for women's health or fetal life. The record before us,
however, does not support that conclusion. As the district
court observed, it is not clear what else Indiana expects to
learn from these additional requests. It has not submitted ev-
idence to support any continued concerns with the Alliance's
current staff, safety record, or ability to comply with its laws.
Indiana's only specific concern appears to have been with a
clinic administrator who is no longer affiliated with the Alli-
ance, and whose suspected connection to a discredited doctor
is tenuous. The state must do more than this. At this stage in
the litigation, on this record, we agree with the district court
that the reasons Indiana asserts in support of its handling of
the South Bend license are unsupported and outweighed by
the substantial burden the state is imposing on women in
northern Indiana.

We stress, however, that further development of the rec-
ord may affect this conclusion. If it does, then additional mod-
ifications to the preliminary injunction might be necessary. If
the Alliance has failed to respond to reasonable requests for
information, as the state contends, then the Alliance can be
compelled to comply. But if, as the Alliance argues, the state
is engaged in a subterfuge, ostensibly seeking information
that would pertain to licensing but in reality ensuring that this
clinic can never receive a license, then both the preliminary
relief and the ultimate disposition of this part of the overall
case would favor the plaintiffs.

At this juncture, bearing in mind that we review decisions
imposing or refusing preliminary injunctions deferentially,
we conclude that the state's motion to stay the district court's
injunction, as modified in our order of June 21, 2019, must for

the most part be denied. Nevertheless, the state makes a strong point when it defends the legitimacy of its licensing process and argues that a wholesale exemption from licensing will tie its hands in an unwarranted way.

We think the best way to accommodate the state's legitimate interest in licensing during the pendency of this litigation is to modify the preliminary injunction further, to clarify that the South Bend clinic is not, uniquely among such clinics in Indiana, exempt from licensing. We can accomplish this by enjoining the state either to treat Whole Woman's Health of South Bend as if it had a provisional license under 410 IND. ADMIN. CODE § 26-2, or actually to grant such a provisional license, to be effective (in the absence of a failure to comply with valid licensing criteria) until the district court issues a final judgment on the merits of the case. This modification of the injunction will ensure that the state continues to have its normal regulatory power over the clinic, including the power to conduct inspections pursuant to IND. CODE § 16-21-2-2.6. The district court is hereby directed to issue a revised preliminary injunction under Federal Rule of Civil Procedure 65(d) that reflects this change.

Furthermore, even before the merits are resolved, the parties are entitled to continue their examination of the state's handling of the licensing process. Although we do not mean to limit the district court's discretion in conducting such an inquiry, we offer some thoughts about questions that would shed light on what is going on. They include the following:

- How has the Department handled previous license applications from abortion clinics?

- What specific evidence of wrongdoing was given to the Department in support of its initial concerns about WWH? Did it attempt to verify that information?
- What evidence did the Department have of a connection between the Alliance and a clinic that had been closed by Indiana in the past?
- What objection, if any, does the state still have against Dr. Jeffrey Glazer, the Medical Director of the clinic?
- Did the Department have reason to doubt the honesty of the Alliance's disclosures? What was it?
- Did the Department understand the meaning of "affiliate" to be ambiguous at the time it required the Alliance to disclose its "affiliates"? Why didn't it specify the information it was seeking?
- Can the Department point to other instances in which it has withheld guidance on the meaning of an ambiguous term in state law in order to assess the honesty or accuracy of a license applicant?
- Did the Department make a specific finding that the evidence submitted by the Alliance was inadequate? What was the basis for that finding? If no finding was made, why not?
- What information supported each of the February 2019 supplemental requests? How did they relate to or advance the state's interests?
- Are there privacy protections for materials turned over as part of obtaining a license? How was the state prepared to comply with statutes protecting the medical records of third parties or patients?

As we indicated earlier, depending on later developments in the record, the district court may need to modify the prelimi-

nary injunction further. On the other hand, since that injunction relates only to the South Bend facility, the court may determine that no further changes are called for.

## V

Almost all the harms Indiana cites have to do with its ability to enforce the rest of its regulatory scheme on licensed clinics. Since we uphold its ability to do so pursuant to the Alliance's *de facto* or real provisional license for the South Bend clinic, the harm to the state of imposing the preliminary injunction as modified by our earlier order and this opinion is *de minimis,* compared to the significant harm the Alliance and its clients would experience from closure of the clinic.

Because we have concluded that, on the present record, the Alliance has shown a likelihood of success on the merits of its undue-burden challenge, we need not address its equal protection arguments. This is also not the time to address the parties' broader arguments about Indiana's licensing scheme. We AFFIRM the district court's grant of the preliminary injunction as modified in accordance with this opinion.