In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 21-2480 & 21-2573

WHOLE WOMAN'S HEALTH ALLIANCE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

TODD ROKITA, Attorney General of Indiana, *et al.*,

*Defendants-Appellants*.

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01904-SEB-MJD — **Sarah Evans Barker**, *Judge.*

———————————

DECIDED SEPTEMBER 8, 2021

———————————

Before FLAUM, EASTERBROOK, and WOOD, *Circuit Judges*.

PER CURIAM. The district court entered an injunction that prohibits officials from enforcing these provisions of Indiana's law:

- Ind. Code §16-34-2-1(a)(1) to the extent this statute limits the provision of first-trimester medication abortion care to physicians; requires a physical examination to be performed on a woman

prior to receiving an abortion; and prohibits the use of telemedicine by requiring the prescriber to be physically present at the abortion facility in order to dispense the abortion-inducing drug and the patient to ingest the drug in the physical presence of prescriber;

- Ind. Code §16-34-2-1(a)(2) providing that second-trimester abortions be performed only in hospitals or ambulatory surgical centers;

- Ind. Code §16-34-2-1.1(a)(1), (a)(4), (b)(1) to the extent these provisions prohibit providers from using telemedicine or telehealth to obtain informed consent from patients or to conduct pre-abortion counseling sessions;

- Ind. Code §25-1-9.5-8(a)(4) prohibiting the use of telemedicine in abortion care;

- 410 Ind. Admin. Code §26-17-2(d)(1)(A), (4), (e)(5) requiring clinics providing aspiration abortions to maintain 120-square-foot procedure rooms, scrub facilities, and 44-inch corridors;

- 410 Ind. Admin. Code §26.5-17-2(e)(1) requiring medication abortion clinics to maintain housekeeping rooms with storage sinks;

- Ind. Code §16-34-2-1.1(a)(1)(E) and (a)(1)(G) requiring women seeking abortion services to be informed that "objective scientific information shows that a fetus can feel pain at or before twenty (20) weeks of postfertilization age" and that "human physical life begins when a human ovum is fertilized by a human sperm"; and

- Ind. Code §16-34-2-1.1(b)(2) to the extent it requires dissemination of a Perinatal Hospice Brochure containing the following: "Studies show that mothers who choose to carry their baby [sic] to term recover to baseline mental health more quickly than those who aborted due to fetal anomaly."

2021 U.S. Dist. LEXIS 149959 at *207–08 (S.D. Ind. Aug. 10, 2021). The officials (collectively Indiana) request a stay of some aspects of this injunction: the "physician-only law as applied to medication abortions, Ind. Code §16-34-2-1(a)(1); [the] second-trimester hospital/ambulatory surgical center requirement, *id*. §16-34-2-1(a)(2); [the] in-person counseling requirement, *id*. §16-34-2-1.1(a)(1), (a)(4), (b)(1); [the] in-person physical examination requirement, *id*. §16-34-2-1(a)(1); and [the] telemedicine ban, *id*. §25-1-9.5-8(a)(4)."

All of the contested provisions have been in force for years, so a stay would preserve the status quo pending appellate resolution. And Indiana has made the "strong showing" on the merits necessary to receive a stay. See *Nken v. Holder*, 556 U.S. 418, 426, 434 (2009).

We start with Ind. Code §16-34-2-1(a)(1). State laws requiring abortions to be performed by physicians have been challenged before, and in *Mazurek v. Armstrong*, 520 U.S. 968 (1997), the Supreme Court held that they are constitutional. The district court nonetheless declared that requiring a physician is unconstitutional with respect to one means of inducing an abortion. That exception does not find any support in *Mazurek* or this court's decisions. See *Whole Woman's Health Alliance v. Hill*, 937 F.3d 864, 874 (7th Cir. 2019); *Planned*

*Parenthood of Indiana and Kentucky, Inc. v. Box*, 991 F.3d 740, 751 (7th Cir. 2021).

Laws requiring second-trimester abortions to be performed in a hospital or surgical center also have been challenged before. Indeed, Ind. Code §16-34-2-1(a)(2) itself was challenged and sustained by the Supreme Court. *Gary-Northwest Indiana Women's Services, Inc. v. Orr*, 496 F. Supp. 894 (N.D. Ind. 1980) (three-judge court), affirmed, 451 U.S. 934 (1981). The Supreme Court's decision was summary and unreasoned, but like other summary dispositions it settled the validity of the contested statute even though it did not establish general principles. Two years later, the Court concluded after full briefing and argument that a materially identical statute in Virginia is constitutional. *Simopoulos v. Virginia*, 462 U.S. 506 (1983).

The requirement of in-person counselling, Ind. Code §16-34-2-1.1(a)(1), (a)(4), (b)(1), likewise is a return litigant. It was contested and held constitutional in *A Woman's Choice v. Newman*, 305 F.3d 684 (7th Cir. 2002). We concluded that the validity of such a statute was established in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 881–87 (1992), which held that a materially identical informed-consent statute does not create an "undue burden" on access to abortion. And if as *Casey* and *A Woman's Choice* hold a state may require in-person meetings with physicians before an abortion, then the validity of the restriction on telemedicine, Ind. Code §25-1-9.5-8(a)(4), follows directly.

Plaintiffs contend, and the district court found, that developments in videoconferencing make it possible to dispense with in-person meetings, that improvements in medicine make the use of hospitals or surgical centers unnecessary, and

that nurses are competent to approve and monitor medication-induced abortions. The district court concluded that these findings permit it to depart from the holdings of earlier cases. Yet the Supreme Court insists that it alone has the authority to modify its precedents, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997), and we added in *A Woman's Choice* that a district judge lacks authority to use new findings to depart from established law. 305 F.3d at 688–89 ("constitutionality must be assessed at the level of legislative fact, rather than adjudicative fact as determined by more than 650 district judges.").

We leave the merits for resolution after full briefing and argument. All we hold today is that existing precedents provide strong grounds for concluding that Indiana is likely to prevail on the contested issues. To the extent that the injunction bars Indiana from enforcing Ind. Code §§ 16-34-2-1(a)(1), (2), 16-34-2-1.1(a)(1), (4), (b)(1), and 25-1-9.5-8(a)(4), it is stayed pending further order of this court.

WOOD, *Circuit Judge*, dissenting from the grant of the stay pending appeal.

Almost 50 years ago, the Supreme Court held that a woman has a fundamental right to decide whether or not to carry a pregnancy to term. *Roe v. Wade*, 410 U.S. 113 (1973). Today, challenges to *Roe*'s holding abound. In *Dobbs v. Jackson Women's Health Org.*, No. 19-1392 (U.S.), cert. granted May 17, 2021, the State of Mississippi has asked the Court to rule that "all pre-viability prohibitions on elective abortions are []constitutional." Petn. For Cert., Question 1. Texas took another approach, by enacting a law that not only bans all abortions after approximately the sixth week of pregnancy, but also disempowers state officials from taking any enforcement action related to that ban, instead authorizing any interested bystander to perform that function. See *Whole Women's Health v. Austin Reeve Jackson, Judge*, No. 21A24 (U.S.), Sept. 1, 2021, denying an application for injunctive relief. And some states have enacted law after law designed to chip away at *Roe*, while piously purporting to protect women's health.[1]

---

[1] It is a mystery to me why the State is unwilling frankly to say that its laws regulating abortion are designed to discourage that procedure to the maximum extent that is constitutionally permissible. The Supreme Court held as early as 1977 that states may express a preference for childbirth over abortion, see *Maher v. Roe*, 431 U.S. 464, 474 (1977), and it reiterated that point in *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992). Rather than insisting that its laws have only the high-minded purpose of protecting women's health, in the face of overwhelming evidence that they have no such effect, it would be preferable from my standpoint to have an open debate about the outer reaches of the state's power to implement laws that have the effect of burdening, or even eliminating, access to abortions.

The Indiana law before us takes the last form. It constricts the performance of abortions in countless ways. The plaintiff organizations provide abortion services in Indiana and elsewhere. In this suit, they originally challenged 25 different parts of the law, on the ground that these provisions impose an undue burden on a woman's right to obtain an abortion. Over time, the case was whittled down. After a full bench trial, the district court entered a permanent injunction against the following aspects of the law:

1. The "Physician-Only Law," Ind. Code § 16-34-2-1(a)(1)(A), but only as applied to so-called medication abortions (*i.e.*, those accomplished by taking two pills);

2. The "Second-Trimester Hospitalization Requirement," Ind. Code § 16-34-2-1(a)(2)(B);

3. The "In-Person Counseling Requirement," Ind. Code § 16-34-1.1(a)(1), (a)(4), (b);

4. The "Telemedicine Ban," Ind. Code § 25-1-9.5-8(a)(4);

5. The "In-Person Examination Requirement," Ind. Code § 16-34-2-1(a)(1);

6. The "Facility Regulations" (specifying the size of procedure rooms and hallways and the type and location of sinks), 410 Ind. Admin. Code 26-17-2(d)(1)(A), (d)(4), (3)(5); 410 Ind. Admin. Code 26.5-17-2(e)(1); and

7. Three "Mandatory Disclosure Requirements" (concerning when life begins, fetal pain, and the woman's mental health), Ind. Code § 16-34-2-1.1(a)(1)(E), (a)(1)(G).

See *Whole Women's Health v. Rokita*, No. 1:18-cv-01904, 2021 WL 3508211 (S.D. Ind. Aug. 10, 2021). The court denied the

Plaintiffs' request for injunctive relief against another 13 provisions, finding instead that the State had the better of the argument.

The very next day, the State filed a notice of appeal, along with a motion to stay the injunction pending appeal. See FED. R. CIV. P. 62(d). The district court denied the stay motion, and so, as permitted by Federal Rule of Appellate Procedure 8(a)(2), the State asked this court to issue the stay. My colleagues have voted to grant Indiana's request. Regretfully, I cannot endorse that action. The district court's rulings were grounded in careful and extensive findings of fact, and in my view scrupulously followed the Supreme Court's guidance in this difficult area. I would deny the stay and allow the appeal to progress in the normal fashion.

## I

Time does not permit more than a cursory overview of the reasons that persuade me that the extraordinary remedy of a stay is not appropriate here, but I wish to highlight a few. The standards for granting a stay do not vary depending on whether it is the United States, a state, or a private party seeking that relief. The Supreme Court made this clear in *Nken v. Holder*, 556 U.S. 418 (2009); its words there are worth recalling:

> A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.

*Id.* at 433–34 (quotation marks and citations omitted). The State of Indiana thus has the burden here of demonstrating the appropriateness of a stay of the district court's injunction.

The *Nken* Court also identified the salient considerations in deciding whether a stay should issue:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 434. With respect to the all-important likelihood-of-success factor, the Court emphasized that more than a negligible chance of success or some possibility of irreparable injury is required. *Id.* at 434–35; see also *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (applicant must make a strong showing of likelihood of success, though that may be less than proof by a preponderance).

The State argues that it has met this standard. It points to several key decisions in its effort to show that the district court erred badly enough that we should immediately freeze its injunction. Those decisions were the following:

- *Mazurek v. Armstrong*, 520 U.S. 968 (1997), which addresses a Montana law restricting the performance of abortions in that state to licensed physicians.

- *Simopoulos v. Virginia*, 462 U.S. 506 (1983), which upheld a Virginia law that required second-trimester abortions to be performed either in a hospital or in some kind of clinic. See also *Gary-*

*Northwest Indiana Women's Servs., Inc. v. Orr*, 451 U.S. 934 (1981).

- *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684 (7th Cir. 2002) ("*Woman's Choice*"), which upheld Indiana's in-person counseling requirement as then understood.

- *Planned Parenthood of Ind. & Ky. v. Box*, 991 F.3d 740 (7th Cir. 2021) ("*PPINK*"), which held that a court must first find that an abortion regulation poses a substantial obstacle to the exercise of the abortion right, and only then engage in balancing burdens against benefits.

- *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), which established the undue burden test and distinguished between a genuine burden and simple inconvenience or expense.

My colleagues believe that the district court's painstaking 158-page opinion ignores these decisions, or worse, openly flouts them. But my colleagues are over-reading the Supreme Court's decisions. As I will show briefly, the Court has always taken the position that for the *Casey* test—as elaborated as recently as five years ago in *Whole Women's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), and then two years ago in *June Medical Servs. v. Russo*, 140 S. Ct. 2103 (2020)—facts matter.

This record is unusually rich in the facts that it contains, because it was compiled after a full trial on the merits. That record shows that the decisions on which the State is relying do not resolve the issues before us, because there are critical factual differences between those cases and this one. There is also extensive evidence in the record supporting a finding

that the Indiana laws that the district court enjoined pose serious problems under the Supreme Court's governing abortion jurisprudence. (Obviously, if the Court chooses to accept Mississippi's invitation to overrule *Roe v. Wade*, then everything is up for grabs. As a lower court judge, however, I must proceed on the assumption that nothing has changed until the Court says so. See *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989).)

## II

I begin with *Mazurek*. As I indicated above, this case involved the constitutionality of a Montana law that restricted the performance of abortions to "licensed physicians." A group of doctors, plus the *only* physician assistant in the entire state who then performed abortions, sued to enjoin that aspect of the law. The district court refused to do so; the Ninth Circuit vacated its decision; and the Supreme Court then agreed to hear the case.

The Court's opinion leaned heavily on the district court's finding that there was insufficient evidence in the record that a law that disabled only one abortion provider (the physician assistant) from providing these services could amount to a prohibited "substantial obstacle" to abortions. 520 U.S. at 973. In our case, in contrast, the district court found that the Physician-Only law "significantly reduced" the pool of Indiana's abortion providers. This problem was exacerbated, the court added, by Indiana's physician-supervision requirement. *Mazurek*, in contrast, is best read as holding only that the plaintiffs had no evidence that Montana had an improper purpose in passing its law (*i.e.*, a purpose of impeding access to abortion), contrary to what the Ninth Circuit had held. The district court pointed out that this court

has not yet addressed *Mazurek*'s precise scope and application. *PPINK* does not fill that gap; it speaks only to state laws that limit abortion providers to licensed *professionals*. See 991 F.3d at 751. Indiana's physician-only rule sweeps more broadly.

The *Mazurek* Court also found it significant that "what [was] at issue" was "not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher." 520 U.S. at 972. In our case, in contrast, the plaintiffs went to trial and were subjected to adversarial testing before they secured the injunction.

Finally, I do not agree with my colleagues to the extent that they may be saying that *Mazurek* resolved the physician-only issue with respect to every type of abortion imaginable. In *Whole Woman's Health Alliance v. Hill*, 937 F.3d 864, 874 (7th Cir. 2019) ("*WWHA*"), we did not go so far as to say that. Indeed, *Mazurek* is cited only once in *WWHA*. More importantly, *Mazurek* had nothing to say about "pill" abortions, for the simple reason that they did not exist at the time. It is thus at best an extension of *Mazurek* to say that a decision meant to address an invasive physical procedure (using "sharp, surgical instruments," as the State puts it in its Reply to Plaintiffs' response to its motion), whether an aspiration abortion, a dilation and curettage (D&C) abortion, or a dilation and evacuation (D&E) abortion, applies with equal force to the act of handing a person two pills and telling her when to take each one. On full merits review, we may decide that this is the case, or we may decide otherwise. But there is no reason to think that the district court was disregarding

Supreme Court precedent when it thought that this factual distinction matters.

Next, I turn to the second-trimester hospitalization requirement. This requires attention to *Simopoulos*, which concerned a Virginia statute criminalizing the performance of abortions outside of hospitals. One cannot look at *Simopoulos* without at the same time considering *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1983), and *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476 (1983). The latter two cases both struck down state statutes that required all abortions after 12 weeks of pregnancy to be performed in a hospital. *Simopoulos* distinguished them on grounds that are critical here. Unlike the rigid hospital requirement in *Akron* and *Kansas City*, the Virginia law challenged in *Simopoulos* allowed outpatient surgical hospitals to qualify for licensing that permitted abortions. The district court thought that the latter option referred only to something like the ambulatory surgical centers (ASCs) in Indiana, but that is not clear. The Supreme Court emphasized that it saw "no reason to doubt that an adequately equipped clinic could, upon proper application, obtain an outpatient hospital license permitting the performance of second-trimester abortions." 462 U.S. at 518–19. Here, the record shows that outpatient abortion clinics could be just such an "adequately" equipped site. Yet Indiana's law categorically bans them from performing abortions.

In addition, *Simopoulos* relied on data from the American College of Obstetrics and Gynecology (ACOG) indicating that second-trimester abortions during or prior to the 16th week of pregnancy (that is, 16 weeks after the woman's last menstrual period) could be performed in "free-standing qualified

clinics that meet the state standards required for certifica-
tion." *Id.* at 517. The district court understood this as a fact-
based comment, and it was in that context that it observed
that the medical consensus about what is needed for safe D&E
procedures has evolved. In so doing, it followed ACOG's cur-
rent advice, just as the Court had done years earlier in *Si-
mopoulos*. Moreover, the district court recognized that much
of this discussion in *Simopoulos* was *dicta*: the physician chal-
lenging Virginia's law had not attacked the Virginia regula-
tions "as being insufficiently related to the State's interest in
protecting health." *Id.* Under the circumstances, the district
court was not unreasonable to think that there was room to
consult modern standards from the same authoritative
source.

The last case that deserves a nod is *Woman's Choice*. That
decision addressed an earlier version of many of the same In-
diana rules now before us. For example, it considered
whether Indiana's requirement that someone seeking an
abortion must make two separate visits to a medical facility
was unduly burdensome. The opinion did not flatly say that
all such requirements are permissible, full stop. Instead, it left
open the possibility that a different record might change the
analysis under *Casey*: "This is not to say that a two-visit re-
quirement *could not* create a burden comparable to a spousal-
notice requirement." 305 F.3d at 691. It added this:

> *The record in this case* does not show that a two-visit rule
> operates similarly to a spousal-notification rule by fa-
> cilitating domestic violence or even inviting domestic
> intimidation. It shows nothing except a decline in the
> number of abortions in Mississippi and Utah—leaving
> open both the extent to which other states would

> experience the same effect and the reason *why* the effect
> occurs.

*Id.* at 692 (emphasis added). The record now before us fills those gaps—or at least the district court may not have clearly erred in finding that it did. At this stage, with the burden on the State to justify the stay pending appeal, I do not see anything requiring the immediate suspension of the district court's decision.

### III

Finally, I would like to address some of the particulars of the Indiana regime, to show once again that this case is not the open-and-shut matter that it apparently seems to my colleagues.

Indiana passed the first of the laws challenged in this litigation in 1973. In the decades since then, during which the cases on which Indiana relies were decided, facts on the ground have changed. Today, most women seeking abortions within the first 10 weeks of pregnancy use medication abortion. See *Food & Drug Admin. v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578, 579 (2021) (Sotomayor, J., dissenting). The federal Food and Drug Administration ("FDA") first approved mifepristone, a medication sold under the brand name Mifeprix, to provide medication abortions in 2000—nearly thirty years after Indiana's law was passed. Medication abortion is now most commonly provided via a combination of mifepristone and misoprostol, two hormonal drugs that are also commonly used for other reproductive healthcare. Notably, these drugs are also the most effective treatment for miscarriage management. Meanwhile, telehealth has rapidly expanded since 1973 (and was turbo-charged by the COVID-19

pandemic), and providers routinely provide a wide range of important care remotely. These facts matter, as a look at the enjoined provisions of the law demonstrates.

A.    Indiana's Physician-Only Law

Indiana's "Physician-Only Law" specifies that *only* a physician may perform a first-trimester abortion in the state. See Ind. Code § 16-34-2-1(a)(1). As a result, the law prohibits Advance Practice Clinicians (APCs), such as physician assistants and nurse practitioners, from providing abortions. The district court permanently enjoined the Physician-Only requirement to the extent it applies to first-trimester medication abortion, but not as it applies to aspiration abortions.

As the district court noted, a 2015 analysis found "nothing more than a minimal difference" in safety and effectiveness between medication (and aspiration) abortions provided by APCs and those provided by physicians. The district court, weighing expert testimony, found that there is no clinically significant difference between medication abortions provided by an APC as opposed to a physician.

APCs are subject to all generally applicable laws and regulations that define the scope of practice and set professional standards in Indiana, outside of abortion settings. See Ind. Code §§ 25-22.5-1-1.1(i)(1), 25-23-1-1, 25-23-1-19.4; 844 Ind. Admin. Code §§ 2.2-1.1-13, 2.2-1.1-16; 848 Ind. Admin. Code §§ 3-1-1, 3-1-2, 4-1-4, 4-2-1. Physician assistants must be supervised by licensed physicians pursuant to written supervisory agreements. See Ind. Code § 25-22.5-1-1.1(i)(1); 844 Ind. Admin. Code 2.2-1.1-16. Nurse practitioners practicing in outpatient settings are required to collaborate with licensed

physicians, also pursuant to written agreements. See Ind. Code § 25-23-1-19.4.

In 2016, the FDA amended the labeling directions for Mifeprix. The label now provides that "any certified healthcare provider" or any "certified prescriber" is authorized to provide Mifeprix so long as the provider: (1) can diagnose ectopic pregnancies, and (2) can either provide surgical intervention in the case of an incomplete abortion or severe bleeding, or has "made a plan to provide such care through others." *Whole Woman's Health All. v. Rokita*, 2021 WL 3508211, at *25. As the district court held, this amended label amounts to an FDA endorsement of APCs' ability safely and competently to provide medication abortion. *Id.* Notably, APCs are authorized to provide medication abortions in about one-third of states (and to provide first-trimester aspiration abortions in about one-quarter of states).

It also is telling that APCs are authorized to provide a wide range of non-abortion-related medical services, many of which are far riskier than abortion. Significant medical complications from abortions are extraordinarily rare, and practically nonexistent for medication abortions. As the record shows, less than one-quarter of one percent of abortion patients have a complication that requires hospital admission, surgery, or a blood transfusion. R. 234-1 at 150-51. Clinically significant complications affect only 0.16 and 0.31% of women. *Id.* As the district court noted, "[e]ven fewer complications—0.06%" for medication abortion "necessitate hospital admission." *Rokita*, 2021 WL 3508211, at *7.

At the same time, the state trusts advance practice registered nurses who meet certain licensing requirements "to prescribe drugs, including controlled substances." Ind. Code

§ 24-23-1-19.5; 848 Ind. Admin. Code 5-1-1. Similarly, physi-
cian assistants are authorized to prescribe controlled sub-
stances. See 844 Ind. Admin. Code 2.2-3. APNs and physician
assistants can and do prescribe opioids, subject to essentially
the same regulations as physicians. See 848 Ind. Admin. Code
5-4-5; 844 Ind. Admin. Code 2.2-3; 844 Ind. Admin. Code 5-6-
6. And just for context, it is worth recalling that the Centers
for Disease Control and Prevention report that since 1999,
nearly 841,000 people have died from drug overdoses. See
CDC, The Drug Overdose Epidemic (updated Mar. 15, 2021),
https://www.cdc.gov/opioids/data/index.html. Nothing re-
motely resembling that level of danger exists for any kind of
abortion.

   The State argues that the physician-only requirement
ensures that patients are appropriately screened for
contraindications for medication abortion, most notably
ectopic pregnancies. See Mot. for Stay at 35. But that concern
is resolved by the FDA's unchallenged labeling instructions,
which specifically state that only providers who can diagnose
ectopic pregnancies may prescribe the drugs. In Indiana, as
the district court explained, "APCs are fully qualified to
screen for the contraindications of medication abortion."
*Rokita*, 2021 WL 3508211, at *43. In fact, Indiana's APCs are
licensed to review and interpret ultrasounds for abortion
patients and others—that is, to screen for ectopic pregnancies
and similar contraindications. *Id.*

   As I noted before, medication abortion is administered
through a combination of mifepristone and misoprostol. The
district court found that this exact combination of drugs is
also considered the most effective medical treatment for mis-
carriage management, and that this regimen involves

precisely the same (exceedingly rare) risks when used to provide a medication abortion. *Id.* at *7. In Indiana, advance practice clinicians can and do provide both mifepristone and misoprostol for miscarriage management, at the same time as the State purports to be too worried about their competence to permit them to prescribe the same medication for abortion. *Id.* at *25–27.

Misopristol is also commonly used to induce labor in a term pregnancy or to "open the cervix before any procedure that's done inside the uterus, including endometrial biopsy, hysteroscopy, placement of an IUD." Phase 1 Tr. Vol. II, 67:5-12. In Indiana, APCs routinely provide these same procedures, including IUD insertions, which can risk perforation of the uterus. *Rokita*, 2021 WL 3508211, at *26.

Finally, there is childbirth. In Indiana, certified nurse midwifes are authorized to perform vaginal deliveries, including related care such as suturing torn vaginal tissue. *Id.* And childbirth is significantly more dangerous than abortion. As many as 10% of women who give birth are hospitalized for complications associated with pregnancy (not counting their hospitalization for delivery alone). See R. 234-1 at 151. Nationwide, the maternal mortality risks associated with live birth are 14 times higher than induced abortion. *Id.*

B.     Telemedicine Ban, In-Person Counseling Requirements, and In-Person Examination Requirements

Indiana's Telemedicine Ban bars providers from using telemedicine to provide "an abortion inducing drug." Ind. Code § 25-1-9.5-8(a)(4). Indiana also requires that a physician "examine a pregnant woman *in person*" before prescribing medication abortion, and that all mandatory pre-abortion

"counseling" be provided "in the presence" of the patient.
Ind. Code § 16-34-2-1.1(a) (emphasis added).

Abortion providers must furnish this counseling to the patient at least 18 hours in advance of an abortion. They are required to furnish information that the district court found was misleading, intended only to deter the choice of an abortion. Among other requirements, providers must provide a copy of the State's "Informed Consent Brochure" and, if a fetal anomaly has been identified, a copy of the State's "Prenatal Hospice Brochure." Ind. Code § 16-34-2-1.1(a)(4),(b). Although these brochures are easily available online, they must be provided in person rather than by telemedicine. Because plaintiffs must visit an abortion clinic to get mifepristone in the first place, and because there are no abortion clinics in 96% of Indiana counties, people who need abortions are effectively required to travel to an abortion clinic and stay in another county overnight. As the district court found, the law forces low-wage workers with no paid time off and no control over their work schedules to put their jobs and wages at risk to seek an abortion in Indiana.

The district court credited the testimony of an expert who testified that "the process for obtaining informed consent via telemedicine is 'identical' to the process of obtaining informed consent in person, that no aspect of the process differs when telemedicine is utilized" and that no part of the counseling or informed consent process requires in-person interaction. *Rokita*, 2021 WL 3508211, at *20. Moreover, the plaintiffs' expert co-authored a peer-reviewed study finding that abortion patients in other states found telemedicine to be effective. Studies also showed high levels of satisfaction with telemedicine by the providers. *Id.* at *21. Finally, the district

court credited the testimony indicating that screening for other sensitive issues, such as domestic violence, was not impeded by the telemedicine format. *Id.*

Nonetheless, Indiana bars doctors from using telemedicine to prescribe an abortion-inducing drug. The FDA requires patients seeking medication abortion physically to visit an abortion clinic or hospital: mifepristone may not be dispensed at a pharmacy or mailed. Plaintiffs have not attacked that rule. In other states, compliance is achieved by using a "site-to-site" form of telemedicine, where a patient visits an abortion clinic but meets through remote technology with a provider who is not physically present at the same clinic. *Rokita*, 2021 WL 3508211, at *15. Providers use direct, face-to-face communication to discuss medication abortion, obtain informed consent, and prescribe the pills, which are then provided person-to-person by staff members at the clinic. *Id.* In Indiana, Planned Parenthood uses this model for other reproductive care, such as birth control. *Id.* As the district court noted, providers can review a patient's ultrasounds, review medical histories, and use videoconferencing to determine whether medication abortion is appropriate for any patients.

The district court found that "there was no significant difference in the rate of adverse events between [abortion] patients who received telemedicine care compared to those who received in-person services." *Id.* It rested this conclusion on expert testimony, a peer-reviewed study of 20,000 abortion patients in other states, a systemic review of research on telemedicine generally, and expert organizations like ACOG's strong support for telemedicine as a safe and effective way to provide medication abortion.

In summary, the record revealed almost nothing on the benefit side of the balance for the in-person requirement. The burdens, in contrast, are considerable: prolonged unwanted pregnancies, increased health risks, exposure to violent partners who may discover their pregnancies, potentially catastrophic financial hardship for working-class patients who lose much-needed wages or even their jobs, and perhaps most importantly, the risk of pushing people past the window for a medication abortion.

C.      Second-Trimester Hospitalization Requirement

Last, it is worth looking at the court's evaluation of Indiana's "Second Trimester Hospitalization Requirement," which provides that "after the first trimester of pregnancy," abortions may be "performed [only] in a hospital or ambulatory outpatients surgical center." Ind. Code § 16-34-2-1(2). Indiana already criminalizes abortion after "the earlier of viability of the fetus or twenty (20) weeks of postfertilization age," Ind. Code § 16-34-2-1(a)(2), except where required to protect the life or physical health of the mother, *id.* (a)(3). Twenty weeks post-fertilization translates to 22 weeks after a woman's last menstrual period (colloquially known as 22 weeks of pregnancy). Thus, the Second Trimester Hospitalization Requirement applies only to a subset of second-trimester abortions, as the second trimester lasts through the 26th week of pregnancy and this suit does not challenge the 20-week line.

Abortions can be provided using aspiration up to 16 weeks after a patient's last menstrual period, but 90% of second-trimester abortions are performed with D&Es. *Rokita*, 2021 WL 3508211, at *29. The district court found that "second-trimester D&E abortions in places outside of Indiana

can be and are safely performed in out-patient, office-based settings." *Id.* Unrebutted testimony presented to the district court explained that today's D&Es do not require a sterile operating room, because they do not require any incisions into sterile tissue or general anesthesia. Thus, abortion patients do not benefit from additional regulation of hospitals when "the primary purpose of such requirements is to ensure the sterility of operating rooms." *Id.* Ambulatory surgical centers are no more equipped than out-patient medical clinics to treat the potential—and exceedingly rare—complications of a D&E abortion. In such a rare case, both an outpatient clinic and ASC would transfer a patient to the nearest hospital. *Id.* at \*30. This is confirmed by unrefuted peer-reviewed research and expert testimony finding that second-term abortions are safely and routinely performed in outpatient settings in other states. Once again, miscarriages offer a revealing comparison: providers can and do provide D&Es for miscarriage management at office-based settings.

Based on this record, the district court found that the benefits of Indiana's law are illusory, while its burdens are very tangible. It created an extensive record supporting these findings. Most importantly, it operated within the room that earlier Supreme Court and Seventh Circuit decisions gave it. Facts matter. Although the court upheld most of the provisions of the Indiana law that the plaintiffs challenged, it found that the provisions I have discussed impose an undue burden on the set of women for whom the law makes a difference—Indiana women of limited means who cannot leave their jobs, pay for extensive travel, obtain access to cars, and potentially go out of state, simply to obtain a lawful abortion. I would find, for purposes of the pending stay motion, that these findings are sufficiently well supported to undermine the State's

likelihood of success on the merits, and that the State failed to carry its burden with respect to the remaining criteria for a stay.

I therefore respectfully dissent from the decision to order a stay of the court's injunction.